CARLITO AIME vs. COMMONWEALTH.

Suffolk. December 8, 1992. - April 5, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Bail. Moot Question. Due Process of Law*, Substantive rights, Right to hearing.

Provisions of St. 1992, c. 201, §§ 3, 4, amending the Massachusetts bail statute, G. L. c. 276, § 58, by providing that any officer authorized to admit an arrested person to bail might refuse to release that person if the officer, in the exercise of discretion, determined that such release would "endanger the safety of any other person or the community," and requiring the officer to take into account the "nature and seriousness of the danger to any person or to the community that would be posed" by the arrested person's release, were held to violate the due process clause of the Fourteenth Amendment to the United States Constitution under principles articulated by the Supreme Court of the United States in *United States* v. *Salerno*, 481 U.S. 739 (1987), where the challenged provisions applied to all arrested persons, not only those arrested for a specific category of serious crimes; where they did not require the Commonwealth to produce clear and convincing evidence in support of its showing that an arrested person's release would endanger the community; and where they did not guarantee to an arrested person the right to be heard or the right to cross-examine adverse witnesses in a bail proceeding. [671-684]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on October 27, 1992.

The case was reported by *Wilkins*, J.

*Edward M. Altman, Daniel Kanstroom & Christopher Sundermeier* for the plaintiff.

*Jane A. Sullivan*, Assistant District Attorney (*Ralph J. Cinquegrana*, Assistant District Attorney, with her) for the Commonwealth.

*Scott Harshbarger*, Attorney General, *Pamela L. Hunt & William J. Meade*, Assistant Attorneys General, for the Attorney General & others, amici curiae, submitted a brief.

*William J. Leahy, Brownlow M. Speer & Michael R. Schneider*, for Committee for Public Counsel Services, amicus curiae, submitted a brief.

*Andrew Good*, for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

LIACOS, C.J. The 1992 amendments to the Massachusetts bail statute (amendments) provide that an official authorized to admit a prisoner or an arrested person to bail (judicial officer) may refuse to release that person if the judicial officer determines, in the exercise of his or her discretion, that "such release will endanger the safety of any other person or the community." St. 1992, c. 201, § 3, amending G. L. c. 276, § 58 (1990 ed.). The amendments also mandate the judicial officer take into account the "nature and seriousness of the danger to any person or to the community that would be posed by the prisoner's release" when determining the amount of bail. St. 1992, c. 201, § 4. The plaintiff, Carlito Aime, challenges the constitutionality of these provisions. We hold that the challenged portions of the amendments violate the due process clause of the Fourteenth Amendment to the United States Constitution.

On October 8, 1992, Boston police searched Carlito Aime's apartment. The search yielded a small quantity of crack cocaine as well as approximately $44,350 in cash. Aime was arrested. The next day, Aime was arraigned in the Dorchester Division of the District Court Department on charges of possession of a class B controlled substance with intent to distribute, in violation of G. L. c. 94C, § 32A (1990 ed.). At the arraignment, the prosecutor briefly described the circumstances of Aime's arrest and recommended that bail be set at $10,000. Aime's counsel requested that the court set bail at $200. He based this request on Aime's steady record

of employment, the presence of Aime's family in the court-room, and Aime's roots in the community.[1]

Citing the 1992 amendments to the bail statute, the judge rejected both of these proposals. "[U]nder the new bail laws just signed yesterday," the judge stated, "this man is a danger to the community. He's a dealer in drugs, at least on the surface he has all of the paraphernalia that needs to be. And that, with this new bail statute, it's for keeping the people like this individual in court." The judge proceeded to set bail in the amount of $100,000 cash or $1,000,000 surety.[2]

Aime immediately requested a de novo review of the bail determination in the Superior Court. On October 13, 1992, a Superior Court judge heard oral arguments and ruled against Aime.[3] Aime subsequently sought an expedited bail review by a single justice of this court pursuant to G. L. c. 211, § 3 (1990 ed.). Aime argued that the amendments to the bail statute violate the Eighth and Fourteenth Amendments to the United States Constitution as well as arts. 1, 10, 12, and 26 of the Massachusetts Declaration of Rights.[4] On October 29, 1992, a single justice heard oral arguments. The single justice found that "the proceedings in the District Court apparently were not conducted in accordance with the requirements of due process (see *United States* v. *Salerno*, 481 U.S.

---

[1]Aime's counsel asserted that the large amount of cash which the police found in Aime's apartment came from the sale of his uncle's house. This money, counsel stated, was intended to cover Aime's impending tuition for his studies at the University of Massachusetts.

[2]On the form used in the District Court to explain his decision, the judge stated that Aime's involvement in "large scale drug activity" makes him a "danger to the community," and that Aime "falls under the reason for the new bail statute." The judge also marked the following standardized explanations: the "nature and circumstances of the offense charged," the "potential penalty the defendant faces," and the "defendant's failure to appear at a court proceeding to answer to an offense."

[3]Aime's counsel reports that the Superior Court judge stated that she would defer to the findings of the District Court judge on the ground that that judge " 'knows his neighborhood' and what would be a danger to that community."

[4]In the view we take under the Federal Constitution, we do not discuss the State constitutional law claims.

739 [1987])." Consequently, he ordered that Aime's bail be reduced to $10,000.

On November 3, 1992, the single justice reserved and reported to the full bench the "case" and the "general question of law as to what procedural protections due process considerations require" when a judge seeks to apply the amendments to the bail statute. The single justice also reported "the specific question whether [Aime's] due process rights were denied" in the present case. See Mass. R. A. P. 5, as amended, 378 Mass. 930 (1979).[5]

At the outset, we must respond to the Commonwealth's argument that this report should be discharged as moot. See *Attorney Gen.* v. *Commissioner of Ins.*, 403 Mass. 370, 380 (1988), and cases cited. The Commonwealth points out that Aime no longer has a personal stake in the outcome of this litigation. Aime has posted bail following the order of the single justice, and the Commonwealth reports that he was subsequently indicted for unlawful possession of a controlled substance. As the single justice found, however, the present case involves an issue "of public importance, capable of repetition, yet evading review." *Superintendent of Worcester State Hosp.* v. *Hagberg*, 374 Mass. 271, 274 (1978). In such circumstances, we do not hesitate to reach the merits of cases that no longer involve a live dispute so as to further the public interest. *Id.*

Prior to the amendments, the bail statute mandated the release of an arrestee on personal recognizance without surety unless a judicial officer determines that "such a release will not reasonably assure the appearance of the prisoner before the court." G. L. c. 276, § 58 (1990 ed.).[6] The

---

[5]We acknowledge with appreciation the excellent briefs filed by the Committee for Public Counsel Services, the Massachusetts Association of Criminal Defense Lawyers, and the Attorney General and district attorneys of the Commonwealth, as amici curiae.

[6]In this context, G. L. c. 276, § 57 (1990 ed.), defines judicial officers to include a "justice of the supreme judicial or superior court, a clerk of courts or the clerk of the superior court for criminal business in the county of Suffolk, a standing or special commissioner appointed by either of said courts or, in the county of Suffolk, by the sheriff of said county with the

statute also directed the judicial officer to take into account several factors in determining the amount of bail.[7] Thus, the amendments to the statute create an additional ground for refusing to release an arrestee: An arrestee may be denied release if "such release will endanger the safety of any other person or the community." St. 1992, c. 201, § 3. The amendments also direct judicial officers making bail determinations to take into account an additional factor: the "seriousness of the danger to any person or the community that would be posed by the prisoner's release." St. 1992, c. 201, § 4.

Aime argues that the amendments violate the due process clause of the Fourteenth Amendment because they infringe on the fundamental right to be free from arbitrary governmental detention. Aime notes that the amendments do not require that the Commonwealth prove the dangerousness of an arrestee as a predicate to detention. Aime points out that the amendments apply to all arrestees, prior to their conviction of the crimes alleged, regardless of the seriousness of the crimes with which they are charged. In these circumstances,

---

approval of the superior court, a justice or clerk of a district court, [and] a master in chancery." Statute 1992, c. 201, § 1, amends this section to read that a judicial officer may admit a person to bail if "he determines that such release will reasonably assure the appearance of the person before the courts and will not endanger the safety of any other person or the community." Statute 1992, c. 201, § 2, further amends § 57 by limiting the persons authorized to admit to bail so that persons arrested and charged with certain specified offenses (e.g., G. L. c. 208, §§ 18, 34B, or 34C; G. L. c. 209, § 32; G. L. c. 209A, §§ 3-5; G. L. c. 209C, §§ 15 or 20) "shall not be released out of court by a clerk of courts, clerk of a district court, bail commissioner or master in chancery."

[7] These factors include the "nature and circumstances of the offense charged, the potential penalty the prisoner faces, the prisoner's family ties, financial resources, employment record and history of mental illness, his reputation and the length of residence in the community, his record of convictions, if any, any illegal drug distribution or present drug dependency, any flight to avoid prosecution or fraudulent use of an alias or false identification, or any failure to appear at any court proceeding to answer to an offense, whether the prisoner is on bail pending adjudication of a prior charge, whether he is on probation, parole, or other release pending completion of sentence for any conviction, and whether he is on release pending sentence or appeal for any conviction." G. L. c. 276, § 58 (1990 ed.).

Aime argues, the amendments create a broad preventive detention scheme whereby judicial officers may refuse to release arrestees merely suspected of being dangerous. Such an infringement on individual liberty, Aime claims, is excessive in relation to the governmental interest in protecting the public.

Aime also argues that, even if the infringement on individual liberty occasioned by the amendments was narrowly tailored to further that governmental interest, the amendments do not provide sufficient procedural safeguards against an erroneous deprivation of liberty. He notes that the amendments do not provide that arrestees have the right to testify in their own behalf, that the amendments do not provide the right to cross-examine adverse witnesses, and that the amendments do not require the Commonwealth to meet any burden of proof that an arrestee presents an identifiable threat to society.[8]

The Commonwealth argues in response that the amendments do not create a preventive detention scheme. To support its argument, the Commonwealth points out that the Legislature expressly rejected the bail reform bill originally introduced by the Governor. That bill, the Commonwealth asserts, followed the Federal Bail Reform Act of 1984, 18 U.S.C. §§ 3141 et seq. (1988), and provided for the preventive detention of individuals proven to be dangerous. Rather than enacting such a preventive detention bill, the Commonwealth argues, the Legislature merely chose to add another ground for refusal of release without surety — the arrestee's dangerousness — to the existing bail statute. The Commonwealth further asserts that the procedural protections already in place in the bail system provide sufficient safeguards

---

[8] Aime's brief states that he challenges the constitutionality of §§ 1 through 4 of the 1992 amendments. However, we address today only the constitutionality of §§ 3 and 4, and of those portions of § 1 that empower officials to refuse to release arrestees found to pose a danger to the community.

against erroneous deprivations of liberty.[9] Properly understood, the Commonwealth concludes, the amendments pass constitutional muster under the due process clause of the Fourteenth Amendment.

The nature of the individual right affected by a challenged statute is of crucial importance to constitutional analysis under the due process clause. The Supreme Court of the United States has construed this clause to provide two basic forms of protection against improper governmental action. "So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin* v. *California*, 342 U.S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko* v. *Connecticut*, 302 U.S. 319, 325-326 (1937)." *United States* v. *Salerno*, 481 U.S. 739, 746 (1987). In substantive due process analysis, the nature of the individual interest at stake determines the standard of review that courts apply when deciding whether a challenged statute meets the requirements of the due process clause. Where a right deemed to be "fundamental" is involved, courts "must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation," *Moore* v. *East Cleveland*, 431 U.S. 494, 499 (1977), and typically will uphold only those statutes that are narrowly tailored to further a legitimate and compelling governmental interest. See *Salerno, supra* at 748-751. If a statute does not infringe on a fundamental right, courts will apply a less exacting standard of review whereby a challenged statute will pass constitutional muster under the due process clause if it "bears a reasonable relation to a permissible legislative objective." *Rushworth* v. *Registrar of Motor Vehicles,*

---

[9] Specifically, the Commonwealth points out that the bail statute, as amended, continues to provide the right to be represented by counsel, to present evidence by "proffer or otherwise," to obtain a de novo review of a bail determination in the Superior Court, and to petition a single justice of the Supreme Judicial Court for an additional review.

413 Mass. 265, 268 (1992), quoting *Pinnick* v. *Cleary*, 360 Mass. 1, 14 (1971).[10]

"Procedural due process" requires that a statute or governmental action that has survived substantive due process scrutiny be implemented in a fair manner. *Salerno, supra* at 746.

---

[10]The concept of substantive due process has generated a great deal of academic and judicial controversy. See Brest, The Fundamental Rights Controversy: The Essential Contradictions of Normative Constitutional Scholarship, 90 Yale L.J. 1063 (1981). Cases such as *Lochner* v. *New York*, 198 U.S. 45 (1905), and *Adair* v. *United States*, 208 U.S. 161 (1908) — where Justices of a bygone era used substantive due process to invalidate economic legislation with which they disagreed — stand in the law as symbols of judicial usurpation of power. See Bork, The Tempting of America: The Political Seduction of the Law 44-46 (1990). Jurists such as Justice Black and Judge Bork have argued that, aside from incorporating the provisions of the Bill of Rights, the due process clause of the Fourteenth Amendment provides only procedural guarantees. Any judicial attempt to breathe substance into the clause, they argued, is bound to result in the *Lochner*-like substitution of judges' values to the will of the people. *Id.* at 32. See *In re Winship*, 397 U.S. 358, 377-385 (1970) (Black, J., dissenting).

While the Justices of the United States Supreme Court have accepted the concept of substantive due process as a necessary check to unrestrained majoritarian rule, they have disagreed deeply as to the methodology that should be used to define fundamental rights under the due process clause. See, e.g., *Michael H.* v. *Gerald D.*, 491 U.S. 110, 127 n.6 (opinion of Scalia, J., with whom Rehnquist, C.J., joined); *id.* at 132 (O'Connor, J., concurring in part, with whom Kennedy, J., joined); *id.* at 137 (Stevens, J., concurring in the judgment); *id.* at 137-147 (Brennan, J., dissenting, with whom Marshall and Blackmun, JJ., joined). See also *United States* v. *Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). Even under the narrowest mode of analysis, however, the right to freedom from physical restraint has been held to be a "core" right in substantive due process analysis. *Michael H., supra* at 121 (opinion of Scalia, J.). See *Foucha* v. *Louisiana*, 112 S. Ct. 1780, 1785 (1992) (freedom from physical detention is "core of the liberty protected by the Due Process Clause from arbitrary governmental invasion"). We understand the decision of the Court in *United States* v. *Salerno*, 481 U.S. 739 (1987), to use substantive as well as procedural due process concepts in its constitutional scrutiny of a preventive detention statute. See *Leader* v. *Blackman*, 744 F. Supp. 500, 507 (S.D.N.Y. 1990). The present case, therefore, does not involve judicial derivation of controversial "new" rights from the Constitution. Cf. *Michael H., supra* at 121-123. Rather, we apply today an established body of constitutional jurisprudence that delineates the circumstances under which the State may deprive an individual of physical liberty. See our discussion, *infra* at 676-683.

See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976). The definition of the interest involved is also a threshold inquiry for procedural due process analysis because the "requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Regents of State Colleges* v. *Roth*, 408 U.S. 564, 569 (1972). Further, the individual interest at stake must be balanced against the nature of the governmental interest and the risk of an erroneous deprivation of liberty or property under the procedures which the State seeks to use, so as to determine whether the due process requirements of the Fourteenth Amendment have been met. *Mathews* v. *Eldridge, supra.* See *Spence* v. *Gormley*, 387 Mass. 258, 274-277 (1982).[11]

With this background we consider the validity of the amendments in light of the mandate of Federal constitutional principles. The amendments create a statutory scheme calculated to protect the public from an arrestee's claimed dangerousness. The amendments use the amount of bail as the means to secure this goal. The amendments thus create an incentive for a judicial officer to set bail in an amount so that an arrestee perceived to be dangerous will not be able to gain his or her liberty pending trial. Further, the amendments generate pressure on judicial officers to detain an ever-increasing number of arrestees: The detention of an individual who could have been released safely under specified conditions is likely to go unnoticed. The pretrial misconduct of any

---

[11]The Commonwealth argues that the reported questions of law are limited to the issue whether the amendments meet the procedural requirements of the due process clause and that our constitutional inquiry should be so confined. We read the reservation and report differently. It is true that the single justice reserved and reported "a general question of law as to what procedural protections due process considerations require," as well as the "specific question whether [Aime's] due process rights were denied in the circumstances." The Commonwealth overlooks, however, the additional language of the report where the single justice states, "I reserve and report *the case and* the general question . . ." (emphasis supplied). Thus we view substantive as well as procedural issues of due process to be before us as the entire case has been put before us. Cf. *Commonwealth v. Andover*, 378 Mass. 370, 375-376 (1979).

released individual, on the other hand, is bound to augment the public insecurity that prompted the adoption of the amendments. In these circumstances, the scope of the amendments has an inherent potential for unrestrained growth. See Tribe, An Ounce of Detention: Preventive Justice in the World of John Mitchell, 56 Va. L. Rev. 371, 375 (1970) (hereinafter, Tribe).

The amendments differ from the Federal Bail Reform Act of 1984 in that they do not explicitly provide for preventive detention. However, they seek to accomplish this goal through the use of the surety which an arrestee must post in order to be admitted to bail.[12] Thus we do not agree with the Commonwealth's argument that the Legislature rejected a preventive detention scheme and merely added an additional, unremarkable factor to the bail statute. The amendments infringe on the individual interest in freedom from detention.

The right to be free from governmental detention and restraint is firmly embedded in the history of Anglo-American law. "Freedom from bodily restraint has always been at the core of liberty protected by the due process clause from arbitrary governmental action." *Foucha* v. *Louisiana*, 112 S. Ct. 1780, 1785 (1992). *Youngberg* v. *Romeo*, 457 U.S. 307, 316 (1982). "[F]reedom of the person from restraint . . . was a common-law right in England in 1215, and long before; it was one of the great rights declared in the thirty-ninth article of the Great Charter; it was insisted upon in all the confirmations of that article, and is there always found in connection with the rights of life and property; its infringement

---

[12]We note that the Federal Bail Reform Act expressly rejects the concept of setting unattainable surety in order to secure the detention of an arrestee. See 18 U.S.C. § 3142(c)(2) ("the judicial officer may not impose a financial condition that results in the pretrial detention of the person"). Even critics of preventive detention of dangerous individuals have thought that a scheme providing for detention without surety is more equitable than a scheme that uses surety as a device to accomplish preventive detention. Dangerousness, these critics reasoned, provides a more appropriate basis for detention than poverty. See Alschuler, Preventive Pretrial Detention and the Failure of Interest-Balancing Approaches to Due Process, 85 Mich. L. Rev. 510, 514 (1986) (hereinafter, Alschuler).

was the chief complaint in the Petition of Right of 1627, and the Habeas Corpus Act of 1679 was passed solely to secure it against usurpation. Altogether, it may be said that the history of the growth and development of the right ·of personal liberty is the main element in the history of early English constitutional law." Shattuck, The True Meaning of the Term "Liberty" in Those Clauses in the Federal and State Constitutions Which Protect "Life, Liberty and Property," 4 Harv. L. Rev. 365, 375-376 (1891). See Tribe, *supra* at 380.

The due process clause of the Fourteenth Amendment embodies the notion that Americans are entitled to "at least the protection against governmental power that they had enjoyed as Englishmen against the power of the Crown." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977). Historic liberties so protected include, if anything, the right to be free from unjustified governmental intrusion on physical liberty. See *id.* See also Alschuler, Preventive Pretrial Detention and the Failure of Interest-Balancing Approaches to Due Process, 85 Mich. L. Rev. 510, 551-558 (1986). Freedom from governmental restraint lies at the heart of our system of government and is undoubtedly a fundamental right. See *Foucha, supra* at 1787; *Salerno, supra* at 750 (recognizing the "fundamental nature" of individual interest in liberty). Thus, Federal constitutional jurisprudence firmly establishes the rule that "in our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Foucha v. Louisiana, supra*, quoting *United States v. Salerno, supra* at 755.

The Supreme Court has held that a dichotomy between "punishment" and "regulatory restraint" determines whether governmental detention of an individual falls within this exception. *Bell v. Wolfish*, 441 U.S. 520, 535-537 (1979). Under this principle, the State may not punish an individual prior to determining his or her guilt in a proceeding that fully comports with the requirements of due process. *Id.* The State, however, may impose a regulatory restraint on the in-

dividual in narrowly-circumscribed situations.[13] *Id.* The State, for instance, may commit an individual to a mental institution if it proves by clear and convincing evidence that the individual it seeks to commit is mentally ill and requires hospitalization for his or her own welfare and the protection of others. *Addington* v. *Texas*, 441 U.S. 418, 431-433 (1979).[14] Similarly, the government may detain a potentially dangerous alien if it makes a particularized showing that the alien creates a threat to society. See *Kellman* v. *District Director, INS*, 750 F. Supp. 625, 628 (S.D.N.Y. 1990), quoting *Carlson* v. *Landon*, 342 U.S. 524, 538-542 (1952).

In *United States* v. *Salerno*, *supra* at 749-751, the United States Supreme Court upheld the constitutionality of the Federal Bail Reform Act of 1984. That Act allows a Federal court to detain an individual if no release conditions "will reasonably assure the . . . safety of any other person and the community." 18 U.S.C. § 3142(f). The Court ruled that the Bail Reform Act falls on the regulatory side of the punishment-regulation dichotomy because Congress intended to prevent danger to society rather than to punish dangerous individuals. *Salerno*, *supra* at 747. Further, the Court ruled, the Act provides extensive safeguards and applies to a narrow set of situations. *Id.* at 749-750. The Act "operates only on individuals who have been arrested *for a specific category of extremely serious offenses*" (emphasis supplied). *Id.* at

---

[13]Whether a restraint of liberty falls on the regulatory side of the dichotomy depends primarily on legislative intent. *United States* v. *Salerno*, *supra* at 747. "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Schall* v. *Martin*, 467 U.S. 253, 269 (1984), quoting *Bell* v. *Wolfish*, 441 U.S. 520, 538 (1979). Unless the Legislature expressly intends to impose punitive restrictions, the court will determine "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Salerno*, *supra*, quoting *Schall* v. *Martin*, *supra* at 269. See *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963).

[14]We note that Massachusetts law requires a heavier burden, proof beyond a reasonable doubt, to sustain a civil commitment of a mentally ill person. See, e.g., *Commonwealth* v. *Nassar*, 380 Mass. 908, 916 (1980).

750, citing 18 U.S.C. § 3142(f). The Act requires that the government "convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id.* In these narrow circumstances, the Court held, society's interest in crime prevention is at its greatest. Given "Congress' careful delineation of the circumstances under which detention will be permitted," *id.* at 751, the Court concluded, the Act's infringement on individual liberty is not excessive in relation to its regulatory goal and comports with the requirements of due process and the presumption of pretrial liberty. *Salerno, supra* at 750-751.

In reaching this decision the Court relied heavily on the Act's incorporation of procedures "specifically designed to further the accuracy" of the judicial officer's determination of dangerousness. *Id.* at 751. The Act, the Court noted, provides that detainees have a right to counsel at the detention hearing. *Id.,* citing 18 U.S.C. § 3142(f). The Act provides that detainees may testify on their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing. *Id.* The Act enumerates factors guiding the judicial officer in the evaluation of the arrestee's dangerousness, including the nature and the circumstances of the charges, the weight of the evidence, the history and characteristics of the putative offender, and the danger to the community if the detainee is released. *Id.* at 750-751. The government must muster clear and convincing evidence to prove its case. *Id.* at 751. The Court observed also that the Act mandates that the judicial officer set forth written findings of fact and a written statement of reasons for his or her decision to detain the arrestee. *Id.* at 752. Finally, the Act provides for immediate appellate review of the detention decision. *Id.* In light of society's needs for crime prevention, the Court concluded, these procedural protections satisfy the strictures of the due process clause. *Id.* at 752.[15]

---

[15]We recite the Court's analysis at length in our effort to reach a reasoned analysis of the 1992 amendments, but emphasize that we do not

A State may not enact detention schemes without providing safeguards similar to those which Congress incorporated into the Bail Reform Act. See *Foucha, supra* at 1786-1787. As the United States Supreme Court restated less than one year ago, the Bail Reform Act is "one of those carefully limited exceptions [to pretrial freedom] permitted by the due process clause." *Id.* at 1787.[16] In *Foucha*, the Court struck down a Louisiana statutory scheme providing for the confinement in a psychiatric facility of a criminal defendant found not guilty by reason of insanity unless the defendant proves that he or she is not dangerous.[17] Unlike the "sharply focused scheme at issue in *Salerno*," the Court ruled, "the Louisiana scheme of confinement is not carefully limited. Under the state statute, [the detainee] is not now entitled to an adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community. Indeed, the State need prove nothing to justify continued detention, for the statute places the burden on the detainee to prove that he is not dangerous." *Id.* at 1786. In these circumstances, the Court concluded, the Louisiana statute violates the due process clause. *Id.* at 1787. See *United States* v. *Mendez Hernandez*, 747 F. Supp. 846, 849 (D.P.R. 1990) (where government fails to follow procedures

mean to imply that a similar approach is mandated under the State Constitution. As previously noted, we do not reach the question under our State Constitution or our body of common law principles.

[16]We note that Congress also acknowledged the need to incorporate protective measures in preventive detention statutes in order to meet constitutional requirements. The Senate Report on the Bail Reform Act stated that, while the committee on the judiciary "is satisfied that pretrial detention is not *per se* unconstitutional," the Committee "recognizes a pretrial detention statute may nonetheless be constitutionally defective if it fails to provide adequate procedural safeguards or if it does not limit pretrial detention to cases in which it is necessary to serve the societal interests it is designed to protect." The Senate Report added that the "pretrial detention provisions of this section have been carefully drafted with these concerns in mind." S. Rep. No. 225, 98th Cong., 2d Sess. 8, reprinted in 1984 U.S.C.C.A.N. 3182, 3191.

[17]The statute applied regardless of whether the individual was insane at that time.

of Bail Reform Act and to provide arrestee with "full-blown" hearing, Bail Reform Act is unconstitutional as applied). Cf. *United States* v. *Edwards*, 430 A.2d 1321 (D.C. 1981), cert. denied, 455 U.S. 1022 (1982) (upholding constitutionality of District of Columbia preventive detention statute).

The challenged portions of the amendments to the Massachusetts bail statute do not pass due process scrutiny under the principles set forth in *Salerno*.[18] The Bail Reform Act

[18]We assume, without deciding, but for the sake of analysis, that the amendments further a permissible regulatory goal rather than impermissible pretrial punishment. See *Salerno, supra* at 746-747. Aime has urged us to reject the punishment-regulation dichotomy altogether and to hold that the Massachusetts Declaration of Rights does not countenance preventive detention. Aime based this argument on the criticism of preventive detention by scholars and judges. See *Salerno, supra* at 763-767 (Marshall, J., dissenting). See also Alschuler, *supra* at 511; Tribe, An Ounce of Detention: Preventive Justice in the World of John Mitchell, 56 Va. L. Rev. 371, 375 (1970). These authorities argue that preventive detention violates the presumption of innocence, that it is dependent on unattainable predictions of human behavior, and that it is incompatible with the historical goals of pretrial detention (e.g., preventing the defendant's flight or protecting witnesses). Alschuler, *supra* at 511. They also argue that preventive detention impedes an arrestee's ability to consult a lawyer or to locate witnesses, and that available empirical studies "strongly suggest that pretrial incarceration makes both conviction and a severe sentence more likely." *Id.* at 517. We note that even advocates of preventive detention have rejected dangerousness as a ground for such detention and have advocated that fundamental principles of Anglo-American law require that arrestees be detained only where the State shows substantial preliminary proof of their guilt. Alschuler, *supra* at 551-557.

We are not insensitive to these arguments. We have on occasion afforded the individual's interest in physical liberty more protection than required by the United States Supreme Court. For example, we require that the Commonwealth prove beyond a reasonable doubt that the release of a mentally ill person would create a substantial risk of physical harm to others as a predicate to involuntary commitment of such person. *Superintendent of Worcester State Hosp.* v. *Hagberg*, 374 Mass. 271, 276-277 (1978). See *Commonwealth* v. *Nassar*, 380 Mass. 908, 916 (1980). By contrast, the United States Supreme Court permits the States to use the less exacting "clear and convincing evidence" standard. *Addington* v. *Texas*, 441 U.S. 418, 433 (1979). However, in light of our conclusion that the amendments do not pass constitutional muster under *Salerno* we need not decide whether arts. 1, 10, 12, and 26 of the Massachusetts Declaration of Rights provide greater protection than the United States Constitution. Likewise, assuming the constitutionality of preventive detention as matter of State law, we need not decide whether the Declaration of Rights

applies only to individuals who have been arrested for a specific category of serious offenses. *Salerno, supra* at 750, citing 18 U.S.C. § 3142(f). In contrast, the amendments to the State bail law apply to any arrestee. See St. 1992, c. 201, § 3. The Bail Reform Act requires that the government provide clear and convincing evidence to support its showing that an arrestee's release would endanger the community. *Salerno, supra* at 752.[19] The amendments do not impose any such burden of proof on the Commonwealth. St. 1992, c. 201, § 3. Rather, the amendments essentially grant the judicial officer unbridled discretion to determine whether an arrested individual is dangerous.

In these circumstances, the amendments operate as "a scattershot attempt to incapacitate those who are merely suspected of . . . crimes." *Salerno, supra* at 750. This feature of the amendments creates a significant potential for abuse. An official making a bail determination may decide to detain an arrestee known as a "trouble-maker,"[20] and may also factor into a bail determination personal beliefs that certain crimes are more repugnant than others.

The amendments do not pass constitutional muster under the due process clause because they do not provide procedures "designed to further the accuracy" of the judicial officer's determination of an arrestee's dangerousness. *Id.* at 751-752. See *Foucha, supra* at 1786. Unlike the Bail Reform Act, the amendments do not provide that an arrestee has the right to testify in his own behalf. Cf. 18 U.S.C. § 3142(f). The amendments also do not provide that the arrestee may

requires greater procedural protections as a predicate to a detention decision than does the United States Constitution.

[19]A Federal judicial officer must consider the weight of the evidence and must set forth written findings of fact and a written statement of reasons for the decision to detain an individual. *Salerno, supra* at 751-752. See *United States v. Phillips*, 732 F. Supp. 255, 269 (D. Mass. 1990) (magistrate's order of pretrial detention revoked because record did not present clear and convincing evidence that detainee's release would endanger community).

[20]Indeed, the Superior Court in the present case reportedly deferred to the District Court judge on the ground that he "knows his neighborhood."

cross-examine adverse witnesses who appear at the bail hearing. Cf. *id.* The core of procedural due process is the adequacy of the hearing provided before a deprivation of liberty or property occurs. See *Mathews* v. *Eldridge,* 424 U.S. 319, 332-333 (1976). The rights to be heard and to cross-examine witnesses are essential components of a hearing in which a presumptively innocent individual may lose his or her freedom.[21] The procedural defects of the hearing contemplated by the amendments violate the requirements of procedural due process which the Supreme Court set forth in *United States* v. *Salerno, supra.* See *Foucha, supra* at 1786-1787.[22]

The Commonwealth has suggested that we should construe the amendments to comport with the requirements of due process. Doing so, however, would require us to engage in a massive rewriting of the statute. Such an undertaking would impermissibly infringe on the lawmaking function of the Legislature. The Governor sent to the Legislature a bail reform bill that essentially followed the provisions of the Federal Bail Reform Act. The Legislature chose to eliminate the procedural protections that were originally incorporated in the Governor's bill. When it did so, the Legislature may have considered the enormous strain which the constitutionally-required procedures would have put on our judicial system. The Attorney General and the district attorneys, as amici cu-

[21]As written, the amendments allow a judicial officer to determine that a detainee's release endangers the community on the sole basis of hearsay. See *United States* v. *Bell,* 673 F. Supp. 1429, 1432 n.** (E.D. Mich. 1987) (Bail Reform Act's clear and convincing evidence requirement and holding in *Salerno* require that hearsay evidence be at least "trustworthy and reliable" in order to be considered). Cf. *Commonwealth* v. *Durling,* 407 Mass. 108, 118 (1990), habeas corpus denied, 789 F. Supp. 457 (D. Mass. 1992) ("[u]nsubstantiated and unreliable hearsay cannot, consistent with due process, be the entire basis of a probation revocation").

[22]Aime has argued that the amendments are unconstitutionally vague because they fail to provide sufficient guidance as to what constitutes "dangerousness." Under the reasoning set forth in *United States* v. *Salerno, supra,* this claim is subsumed by the amendments' failure to link dangerousness to a list of specific crimes. Additionally, the amendments fail to require a judicial finding of dangerousness supported by a consideration of any relevant facts.

riae, inform us that there are approximately 208 arraignments each week in the Boston Municipal Court and 5,774 arraignments a week in the District Court Department. Figures obtained from the office of bail administration show that there are over 100,000 bail releases a year in police stations and county jails.[23] As the Commonwealth conceded during oral argument, reading the procedures of the Federal Bail Reform Act into the Massachusetts bail statute may well "bankrupt" our system of criminal justice.[24] The impact on the courts of this Commonwealth of requiring hearings such as are specified in the Federal Bail Reform Act may be understood best when one considers that over 99% of all criminal matters are filed in State, not Federal, courts. See State Court Caseload Statistics: Annual Report 1990, National Center for State Courts 42 (1992). See also Record State Caseloads in 1990, 78 A.B.A.J. 23 (Aug., 1992). In these circumstances, it is evident that the Legislature must decide whether to impose such a substantial burden on a court system without providing the funds for the additional personnel and resources necessary to discharge such a burden. Thus, we limit ourselves solely to the issue whether the amendments meet the requirements of Federal constitutional law as expounded in *Salerno* and its progeny. Accordingly, we hold that the challenged portions of the 1992 amendments to the bail statute do not comport with due process of law under the due process clause of the Fourteenth Amendment to the United States Constitution.

The case is remanded to the single justice for entry of judgment consistent with this opinion.

*So ordered.*

---

[23]These figures do not include the bail releases that occur in court.

[24]We note that, unlike their Federal counterparts, State judges do not have access to magistrates endowed with the authority to conduct the constitutionally-mandated hearings. Indeed, portions of the amendments specifically prohibit our clerk magistrates, bail commissioners, and others from admitting a prisoner to bail when certain statutory violations are the basis of the criminal complaint or arrest. See note 6, *supra.*