Quinlan, J.
The Commonwealth has moved pursuant to G.L.c. 276, §58A as added by St. 1994, c. 68, §6 for an order of detention directing that, pending trial, the defendants, Eric Mathis and Tim Mathis, “be committed to custody or confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentence or being held in custody pending appeal.” See G.L.c. 276, §58A(4).
In doing so, the Commonwealth has elected to proceed without witnesses and by “proffer,” i.e. an unsworn statement of facts given by the Assistant District Attorney which, the Commonwealth contends, establishes the dangerousness of each defendant. The defendants have objected to the procedure and moved to strike the proffer and for denial of the Commonwealth’s motion for a detention order.
Over the defendants’ objections, the Commonwealth consolidated the hearing on dangerousness as to each defendant. The Commonwealth did so acknowledging that the crimes were separate and distinct and should not be joined at a trial but asserting that consolidation was appropriate since the information to be offered with respect to the dangerousness of each defendant “overlapped.”
Background
Eric Mathis
On September 1, 1994, the Suffolk County Grand Jury returned an indictment numbered 94-11417-001 charging the defendant, Eric Mathis, with intimidation of a witness in violation of G.L.c. 268, §13B, indictment numbered 94-11417-002 charging shoplifting (four counts) in violation of G.L.c. 266, §30A, indictment numbered 94-11421-001 charging the defendant with possession of a firearm not having been issued a firearm identification card in violation of G.L.c. 269, §10(h) and indictment numbered 94-11421-002 charging the defendant with possession of a firearm not having been issued a firearm identification card in violation of G.L.c. 269, §10(h).
Prior to the return of these indictments, the defendant Eric Mathis had been charged in the Dorchester District Court in complaint numbered 9407CR5136 with intimidation of a witness and possession of marijuana. Prior to issuance of that complaint, he had been arraigned in the Dorchester District Court alleging four counts of shoplifting and threats. At arraignment before the District Court, the Commonwealth did not move for a §58A detention hearing. The District Court set a $1,000 cash bail. The case was continued to August 26, 1994 for a probable cause hearing. The Commonwealth requested a continuance on August 26, 1994 asserting that the defendant would be indicted. On September 2, 1994, the Dorchester District Court complaints were dismissed because the defendant had been indicted.
Tim Mathis
On September 1,1994, the Suffolk County Grand Jury returned an indictment numbered 94-11419-001 charging the defendant, Tim Mathis, with possession of a rifle not at home or work without a license in violation of G.L.c. 269, §10(a), indictment numbered 9411419-002 charging the defendant with possession of ammunition not having been issued a firearm identification card in violation of G.L.c. 269, §10(h), indictment numbered 94-11419-003 charging the defendant with assault by means of a dangerous weapon (a handgun) in violation of G.L.c. 265, §15B(b), indictment numbered 94-11420-001 charging the defendant with possession of a rifle not having been issued a firearm identification card in violation of *10 G.L.c. 269, §10(h) and indictment numbered 94-11420-002 charging the defendant with possession of a firearm not having been issued a firearm identification card in violation of G.L.c. 269, § 10(h).
The Detention Hearing
The defendant Eric Mathis was arrested pursuant to a warrant and brought before the Superior Court on September 6, 1994 for arraignment. The Commonwealth requested a one-day continuance of the arraignment so that the defendant could be arraigned with his “co-defendant,” his brother Tim Mathis, representing that it was the Commonwealth’s intention to seek a detention hearing. The defendant returned to court and was arraigned on September 7, 1994. The defendant Tim Mathis was also brought before the Superior Court on September 7, 1994 and arraigned.
At the arraignment before the Superior Court, the Commonwealth moved for a detention hearing as to each defendant pursuant to G.L.c. 276, §58A on the grounds that one of the indictments against the defendant Eric Mathis alleged intimidation of a witness in violation of G.L.c. 268, §13B (#94-11417-001) and one of the indictments against Tim Mathis alleged assault by means of a dangerous weapon (a handgun) in violation of G.L.c. 265, §15B(b) (#94-11419-003) were offenses designated in G.L.c. 276, §58A(1). Neither the Commonwealth nor the defendants requested a continuance of the hearing. The Commonwealth stated its intention to proceed by proffer. There is no issue of unavailability of witnesses or cause for the failure to produce witnesses since the Commonwealth contends that a proffer satisfies the requirements of G.L.c. 276, §58A. Over the defendants’ objections to the hearing and the proffer procedure, the Commonwealth made its proffer subject to a motion to strike. The parties were given the opportunity to prepare and file a memorandum with respect to the issues raised. On September 13, 1994, the court heard further argument.
The Proffer
According to the prosecutor, the proffer was based on police reports, on three photographs marked as Exhibits 1, 2 and 3, on the defendants’ Board of Probation criminal histories, on testimony given before the grand jury, on conversations with police and the defendants’ father and on conversations between the prosecutor and unidentified representatives of the Fuller Street Neighborhood Association. Police reports were not introduced as exhibits. The proffer is summarized as follows:
Eric Mathis
Eric Mathis is alleged to have committed a series of shopliftings at Morton Wine & Liquor Store, 890 Morton Street in Dorchester. While August 10,1994 is not the first day that Eric Mathis has ever been observed stealing beer from that store, the subject matter of this case begins on August 10, 1994. The night manager, Edwin Thomas,[1] indicated that, as of August 10, he was familiar with Eric Mathis and that he knew him only as Eric, one of the kids from the neighborhood who would routinely come into the store. On August 10, it is alleged that Eric Mathis, accompanied by three or four other young black males, entered the store and stole some beer, i.e. a six pack of Heineken, and a twelve pack of Budweiser, and left the store without paying. Police were called and responded. However, by the time the police arrived, neither Eric Mathis nor anyone else alleged to be involved in that particular incident of shoplifting was in the immediate area.
At approximately 7:40 p.m., about forty minutes later, Eric Mathis is alleged to have returned to the store and steal more beer and perhaps some liquor. Eric Mathis is alleged to have said, “You called the police. We’re going to get you now,” or words to that effect. He was apparently making reference to the fact that the police had responded earlier. The police were again called. The police respond and make a second report for shoplifting.
At approximately 11 p.m., Eric Mathis, with others, returns to store and takes more beer without paying. During this incident, Mr. Thomas said, “What are you doing? Pay for the beer” (or words to that effect). Eric Mathis is alleged to have responded, “Mind your own business.” The police were called a third time.
On the following day, August 11, at approximately 6 p.m., Eric Mathis and two others returned to the store. They took some beer and a couple of bottles of rum and left without paying. The police were again summoned. When the police arrived, Mr. Thomas told the police that the shoplifters were out of the store but they were in a car outside the store. The police went to the car and arrested the occupants, including Eric Mathis.
Following his arrest, Eric Mathis was released on bail. On August 12, 1994, Eric Mathis appeared in Dorchester District Court for arraignment. He was released on ball with the condition that he stay away from the area near the store, Morton Wine & Liquor.
On August 13, 1994, Officer Robert Kenney from Area B-3, a Boston police officer who had participated in the arrest the day before and was aware of the condition of bail. Officer Kenney knew both Eric Mathis and the Mathis family, as well as Mr. Thomas and the people at the store. Officer Kenney and Sgt. Ciccolo saw Eric Mathis walking on Morton toward Corbet from the area of the stores. The officers stopped the suspect and reminded him of the terms of his release. Eric Mathis is alleged to have responded, “The only place I can’t go is the liquor store.” The officers attempted to express their understanding of the condition, i.e. all the stores on *11 the block. Eric Mathis is reported to have responded to the effect that he has some clothes in one of those stores that only he could get and “F . . . that. I’m getting mine.” The officers left without making an arrest. They simply warned Eric Mathis to stay off that block and be aware of the conditions of his release.
On August 16, 1994, three days later, the same officers, Sergeant Ciccolo and Officer Kenney, respond to the store, 890 Morton Street, and talked to Mr. Thomas. He told the officers that, at about 6 p.m. on August 16, Eric Mathis came into the store. Mr. Thomas told Eric Mathis, “You’re not supposed to be in here.” Eric Mathis reportedly responded, “Shut up. You’re going to get yours. I ought to smoke you right now. You’re going to see when you get to court.” Based on the information from Mr. Thomas, Eric Mathis was arrested for violating the condition of bail. During the booking search, a bag of marijuana was found. However, Eric Mathis is not charged with any offense relating to the marijuana in the Superior Court.
Tim Mathis
On August 11 when Eric Mathis was arrested, the police searched the car and found two photographs (Exhibits 1 and 2). The person depicted in the exhibits who is bare chested with the purple bandanna about his face is identified by the police as the defendant Tim Mathis.
At about 8:30 on August 16, police respond to a “shots fired” call at 84 Thetford Avenue. Witnesses at the scene stated that Tim Mathis, who is known to some of the occupants of that address, along with another unidentified person, had conversation with some of the occupants looking for a particular person who wasn’t there. They went across the street, stood in the park or the vacant lot across the street for awhile, and then stepped behind some trees. Within a couple of seconds, gunshots came from that direction and struck the house. That investigation is still continuing, although the witnesses do name Tim Mathis as one of the two people involved in that incident.
At approximately 1:30 a.m. on August 17, roughly five hours later, the police respond to another “shots fired” call at 9 Wilmington Avenue. When the police responded to that address, they spoke to Dale Duntin, who stated that he lived at 9 Wilmington Avenue. Mr. Duntin told police that, at approximately 1:30 a.m., Tim Mathis, whom he knew, came up to Duntin’s home and yelled for him to come outside. Mr. Duntin indicated that he had been in front of the home. When he saw Tim Mathis approaching, he went inside, because Mr. Duntin was aware of a prior dispute involving himself and Tim Mathis and the person that Mr. Tim Mathis had been looking for over on Thetford Street regarding some mountain bike that was borrowed or stolen and not returned.
Mr. Duntin saw Tim Mathis coming. He goes inside. He then heard Tim Mathis calling to him. Mr. Duntin want to the door of his home, and with the door open, stood in the doorway. Mr. Duntin told Tim Mathis he would not come out. Tim Mathis said “Come out, or I’ll come in and get you.” Mr. Duntin then closed the door. Two or three seconds later, he heard one shot rip through the door where he had been standing, come through the door, through the hallway inside the home, through the wall to the outside of the wall, and then strike a neighbor’s home where people were at home and sleeping. Tim Mathis was observed by other witnesses to flee on foot. The witnesses also described a rifle similar to those depicted in the photos, although not positively identified as the very same weapon.
There was a second shooting incident at 9 Wilmington at 1:30 a.m. onAugust 17. The next day, August 18, 1994, at approximately 9 p.m., the police responded to a “shots fired” at 254 Fuller Street, the Mathis home which is within a several-block area of both Thetford and Wilmington. The police are respond. When they arrive, they’re admitted by Vernice Mathis, the mother of both of these defendants. The police go in and try to secure the home to determine if there is anyone armed inside or if there was anyone in need of immediate medical attention.
Search & Seizure of Firearms etc.
The officers determine that only Vernice Mathis and another son not before the Court right now, Gary Mathis, are present. As the police are go through one of the bedrooms upstairs, the officers recognize the room as the room depicted in Exhibits 1 and 2. The police then go back and talk to Vernice Mathis and determine from her that she and Mrs. Mathis live there and that she has dominion and control over the entire home. She consents to a police search of the home, including two upstairs bedrooms belonging to Eric Mathis and Tim Mathis respectively. In a room with “Tim,” police found a .32 caliber round of ammunition in the dresser and a .25 caliber round of ammunition underneath the mattress. At that point, Vernice Mathis, who observed the police recover these bullets, told the police that she did not want them to search any further. The police stopped searching.
Shortly thereafter, Willie Mathis, the husband of Vernice Mathis, the father of these two defendants, returned home from work. He saw police cars outside his home. The police tell Willie Mathis why they were called there and that there was an allegation of a shooting at the home. Willie Mathis demands that the police continue to search the home and get any guns in the home out. Based on Willie Mathis’s consent, the police continue to search the home. *12 They continue to search Tim Mathis’s room, finding one more .32 caliber round of ammunition underneath a chair cushion. They also found the photograph marked Exhibit 3 which depicts the two males depicted in Exhibits 1 and 2 and an as yet unidentified person wearing the LA blue baseball cap. One person (identified as Gary Mathis) is seated and holding a handgun. Everyone in the picture appears to be holding some or all of the weapons that are shown in Exhibits 1 and 2, i.e. two long guns and at least two handguns. The photograph indicates that they’re either standing or sitting around this card-type table with a mound of white powder on that table. No similarly appearing white powder was recovered from the home. On the bed in the photograph, there is a multi-colored quilt. According to the prosecutor, there also appears to be a very white section, a bleached-out section which “appears to be very similar in appearance to the white powder mound that appears on the table.” The police then search Eric Mathis’s room and find a .22 caliber round underneath the bed, two sawed-off rifle stocks, the rear end, the wood stock portions of rifles, and one unknown caliber pistol magazine in a dresser drawer.
There was a Mercury Lynx parked outside which Willie Mathis directs the police to search. He claims that it is Tim Mathis’s car. They find one 30-30 rifle round in the car. In bags of rubbish next to the front door, police find an empty box of30-30 ammunition and a second empty box of .32 caliber ammunition containing one live round still in the box. The police finish their search at that time and leave.
The following day, August 19, at approximately 1:30 p.m., Willie Mathis called Sgt. Ciccolo and told him that he found a gun in Eric’s coat pocket a couple of days earlier and he wants the police to take it. Officers, under the direction of Sergeant Ciccolo, responded to 254 Fuller Street. Willie Mathis gave them a .22 caliber long Ruger target pistol which Sergeant Ciccolo identified as the weapon depicted in Exhibit No. 3 which Eric Mathis is holding.
Willie Mathis spoke to Sergeant Ciccolo at approximately 6p.m. onAugust 19. And at that time, Willie Mathis told Sgt. Ciccolo that his son Tim Mathis had threatened to shoot him because he had allowed the police to search the house.[2]
At 6:30 p.m. on August 19, Willie Mathis called Sergeant Ciccolo a second time, telling him that he had found more guns and asking that the police take them. Sgt. Ciccolo personally who responded to 254 Fuller Street. Willie Mathis directed him to the ceiling area in the basement where some plywood had been nailed to the bottom of the support joists. Willie Mathis related to Sgt. Ciccolo that his son, Tim, had sent a friend of his to recover some money that had been in that area of the home. As Willie Mathis was helping the friend, he pulled out a handgun. Sgt. Ciccolo recovered a .25 caliber pistol, eight rounds of 30-30 ammunition, and one Winchester rifle with a sawed-off stock. Sgt. Ciccolo took those items into custody and, at the station, compared the sawed-off Winchester rifle with the two sawed-off stocks that had been recovered earlier from the bedroom of Eric Mathis. In Sgt. Ciccolo’s opinion, the cut and the grain of the wood matched up perfectly.
Criminal Records
In the proffer, the prosecutor noted the criminal records of both defendants. Eric Mathis’s record includes eleven convictions (including a 1993 conviction for breaking and entering in the nighttime, malicious destruction of property valued at more than two hundred and fifty dollars, possession with intent to distribute a Class B controlled substance, breaking and entering in the nighttime, larceny of a motor vehicle, malicious destruction of property over two hundred fifty dollars, possession of burglarious tools, assault with intent to rob, knowingly receiving stolen property and larceny of a motor vehicle) and ten defaults. Eric Mathis also had a juvenile record and an adjudication of delinquent for an assault and battery in the Dorchester Juvenile Court in 1987.
For Tim Mathis, his adult record includes, as the first entry, the threats to Willie Mathis. He has no adult convictions. However as a juvenile, he was committed on three different dates to the custody of DYS for seven different offenses. He was arraigned on a robbery and assault and battery in July of 1994 and in August he was. arraigned before the Dorchester District Court on the Wilmington Avenue shooting.
Reputation
At the close of his proffer, the prosecutor reported that he had spoken to representatives of a neighborhood watch or block group, i.e. The Fuller Street Association who were familiar with the Mathis family. The prosecutor reported that he had advised the association of his intention to seek a detention hearing and the representatives told him that they did not wish to appear. However, they did want it known that, as a group, they feel that the Mathis family has significantly deteriorated the quality of life in that neighborhood, particularly in light of the allegations that Tim Mathis was both an alleged shooter and an intended victim.
Discussion
This case basically raises two issues: 1) whether the Commonwealth should be barred from seeking a detention order because a detention hearing was not sought at the defendants’ first appearance before a court on these offenses, and 2) whether, at a detention hearing pursuant to G.L.c. 276, §58A(4), the Commonwealth may proceed solely by way of proffer. Resolu *13 tion of these issues requires a construction of §58A which “effectuates its primary purpose” and “avoids any serious question of constitutional infirmities.” See Myers v. Commonwealth, 363 Mass. 843, 850-51 (1973).
First Appearance
The Legislature, responding to the decision of Aime v. Commonwealth, 414 Mass. 667 (1993), enacted St. 1994, c. 68, §6 adding G.L.c. 276, §58A. With respect to the issue of “first appearance,” G.L.c. 276, §58A(5) requires that “[t]he [detention] hearing shall be held immediately upon the prisoner’s first appearance before the court unless that prisoner, or the attorney for the commonwealth, seeks a continuance . . .” G.L.c. 276, §58A is patterned after the Federal Bail Reform Act, 18 U.S.C. §3142. 18 U.S.C. §3142(f) also provides that “[t]he [detention] hearing shall be held immediately upon the person’s first appearance before the judicial officer unless that person, or the attorney for the Government, seeks a continuance . . .” Neither statute provides for a remedy where the prosecution fails to comply with the applicable time constraints.
Federal court decisions construing 18 U.S.C. §3142 provide some guidance in construing §58A in a manner consistent with the due process clause of the United States Constitution.[3] The Supreme Court addressed the issue asserted by the defendants concerning the failure to seek pretrial detention at the defendants’ “first appearance” before the court. In United States v. Montalvo-Murillo, 495 U.S. 711, 717 (1990), the Court stated:
. . . Nothing in §3142(f) indicates that compliance with the first appearance requirement is a precondition to holding the hearing or that failure to comply with the requirement renders such a hearing a nullify. It is conceivable that some combination of procedural irregularities could render a detention hearing so flawed that it would not constitute “a hearing pursuant to the provisions of subsection (f)” for purposes of §3142(e). A failure to comply with the first appearance requirement, however, does not so subvert the procedural scheme of §3142(f) as to invalidate the hearing. The contrary interpretation — that noncompliance with the time provisions in §3142(f) requires the release even of a person who presumptively should be detained under §3142(e) — would defeat the purpose of the Act.
Assuming (without deciding) that “first appearance” applies to an indicted defendant’s first appearance before a District Court, that alone would not preclude the Commonwealth from seeking pretrial detention upon a defendant’s subsequent “first appearance” before the Superior Court on an indictment alleging the same offense. The circumstances of this case do not warrant any finding of an egregious abuse of the “first appearance” requirement. The defendants’ objections on that ground are overruled.
Hearing by Proffer
The amendments to the bail statute by St. 1994, c. 68, §§1-7 “create a statutory scheme calculated to protect the public from an arrestee’s claimed dangerousness” while attempting to cure constitutional deficiencies in the predecessor statute, St. 1992 c. 201, §3 as detailed in Aime v. Commonwealth, 414 Mass. 667, 675 (1994). Unlike the predecessor statute, St. 1992, c. 201, §3, G.L.c. 276, §58A(3) explicitly provides for preventative detention. As such, the statute infringes upon an individual’s right to be free from governmental detention and restraint. Aime v. Commonwealth, 414 Mass, at 676. However, as noted in Aime at pp. 676-77, the state may impose a regulatory restraint[4] on an individual in certain “narrowly circumscribed situations.” With respect to pretrial detention, the Supreme Judicial Court stated “[a] State may not enact detention schemes without providing safeguards similar to those which Congress incorporated into the Bail Reform Act.” Aime v. Commonwealth, 414 Mass, at 680 citing Foucha v. Louisiana, 112 S.Ct. 1780, 1787 (1992). “The Bail Reform Act applies only to individuals who have been arrested for a specific category of offenses . . . The Bail Reform Act requires that the government provide clear and convincing evidence to support its showing that an arrestee’s release would endanger the community.” Aime v. Commonwealth, 414 Mass, at 681-82. “A federal judicial officer must consider the weight of the evidence and must set forth written findings of fact and a written statement of reasons for the decision to detain an individual.” Aime v. Commonwealth, 414 Mass, at 682, n.19 citing United States v. Salerno, 481 U.S. 746 (1987). These safeguards are incorporated into §58A.
Due process is a flexible concept. In Myers v. Commonwealth, 363 Mass, at 854, the Court stated:
. . . The Fourteenth Amendment provides that no State shall deprive any person of... liberty without due process of law. “The fundamental requisite of due process of law is the opportunity to be heard.” Grannis v. Ordean, 234 U.S. 385, 394. It is an opportunity which must be granted “at a meaningful time and in a meaningful manner.” Armstrong v. Manzo, 380 U.S. 545, 552. At the very least, due process of law requires that “deprivation of . . . liberty ... by adjudication be preceded by notice and opportunity for a hearing appropriate to the nature of the case." . .. Múlleme v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313. (Emphasis in Myers.)
“Freedom from government restraint lies at the heart of our system of government and is undoubtedly a fundamental right . . . Thus, federal constitutional jurisprudence firmly establishes the rule that ‘in our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.’ ” Aime v. Commonwealth, 414 Mass, at 677, quoting United States v. Salerno, 481 U.S. at 755. “The *14 government’s interest in preventing crime by arrestees is both legitimate and compelling.” United States v. Salerno, 481 U.S. at 749. Like the Bail Reform Act, G.L.c. 276, §58A “narrowly focuses on a particularly acute problem” in which the Commonwealth interests are overwhelming.
However, “[t]he right to be heard and to cross-examine witnesses are essential components of a hearing in which a presumptively innocent individual may lose his or her freedom.” Aime v. Commonwealth, 414 Mass, at 682. The right to be heard and to cross-examine witnesses is expressly included in G.L.c. 276, §58A(4) which provides in pertinent part:
When a prisoner is held under arrest for an offense listed in subsection (1) and upon motion by the commonwealth, the judge shall hold a hearing to determine whether conditions of release will reasonably assure the safety of any other person or the community.
... At the hearing, such prisoner shall have the right to be represented by counsel. . . The prisoner shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information. The rules concerning the admissibility of evidence in criminal trials shall not apply to the presentation and consideration of information at the hearing . . . (Emphasis supplied.)
The language of the statute itself does not further define the type of hearing required. The Commonwealth’s position is advanced in reliance upon federal cases construing the Bail Reform Act, 18 U.S.C. §3142. The defendants, relying upon the due process clauses of the United States Constitution and art. 12 of the Declaration of Rights, as well as on Commonwealth v. Durling, 407 Mass. 108 (1990) (referred to in Aime at 683 n.21) (probation surrender hearing), and Myers v. Commonwealth, 363 Mass. supra (1973) (probable cause hearing), disagree.
Cases construing the comparable provision of the Federal Bail Reform Act, §3142(f) demonstrate two significant differences between §3142 and §58A. Section 3142(f) expressly refers to a “proffer” as a method of presenting information to the judicial officer and §3142(e) provides for a “rebuttable presumption” of dangerousness in certain specified cases. §3142(f) provides in pertinent part:
(f) Detention Hearing . . . the person shall be afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise. The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing. The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence . . . (Emphasis supplied).
In United States v. Gaviria, 828 F.2d 667 (11th Cir. 1987), the Eleventh Circuit held “that the government as well as the defendant may proceed by proffering evidence subject to the discretion of the judicial officer presiding at the detention hearing.” Id. at 669 (emphasis supplied). In United States v. Alonso, 832 F.Supp. 503 (D.Puerto Rico 1993), the court held that the judicial officer had discretion to receive evidence by way of proffer. In Alonso, the government had the benefit of the statutory rebuttable presumption of the defendant’s risk of flight by virtue of the fact the defendant was charged with drug-related offenses carrying a term of imprisonment of ten years or more. See also UnitedStates v. Jessup, 757 F.2d 378, 380-81 (1st Cir. 1985) (meaning of rebuttable presumption under §3142(e)); United States v. Dorsey, 852 F.2d 1068,1069-70 (8th Cir. 1988) (evidence before the magistrate coupled with the statutory presumption justified pretrial detention); United States v. Dillon, 938 F.2d 1412, 1414-15 (1st Cir. 1991) (defendant failed to rebut statutory presumption). G.L.c. 276, §58A includes neither an express provision authorizing the use of a proffer nor a provision creating a rebuttable presumption of dangerousness or risk of flight.[5] Thus, federal cases are not dispositive.
As noted in Aime v. Commonwealth, 414 Mass, at 681 n. 18, the Massachusetts Declaration of Rights has been construed to “on occasion afford[ ] the individual’s interest in physical liberty more protection than required by the United States Constitution.” For example, although the United States Supreme Court permits involuntary commitment under a clear and convincing standard, see Addington v. Texas, 441 U.S. 418, 433 (1979), the Supreme Judicial Court has held that “the Commonwealth must prove beyond a reasonable doubt that the release of a mentally ill person would create a substantial risk of physical harm to others as a predicate to involuntary commitment of such person.” Id., citing Superintendent of Worcester State Hospital v. Hagberg, 374 Mass. 271, 276-77 (1978).
While noting that St. 1992 c. 201, §3 “allow[ed] a judicial officer to determine that a detainee’s release endangers the communiiy on the sole basis of hearsay,” citing United States v. Bell, 673 F.Supp. 1429, 1432 n.** (E.D. Mich. 1987), the Court also noted Commonwealth v. Durling, 407 Mass. 108, 118(1990), habeas corpus denied, 789 F.Supp. 457 (D.Mass. 1992), holding that “[u]nsubstantiated and unreliable hearsay cannot, consistent with due process, be the entire basis of a probation revocation.”[6]
In Commonwealth v. Durling, 407 Mass, supra, the Court considered constitutionally mandated procedures for probation revocation hearings. Such hearings are not dissimilar to detention hearings under §58A since the judge is required to make a factual *15 determination whether a defendant has violated the terms of probation. Id. at 111. “Revocation hearings are not part of a criminal prosecution. Gagnon v. Scarpelli, 411 U.S. 471 (1972). Thus, although a liberty interest is implicated, a probationer need not be provided with the full panoply of constitutional protections applicable at a criminal trial.” Id. at 112. A probationer’s liberty interest must be balanced with the Commonwealth’s interest in expeditiously dealing with the threat to the public welfare posed by a probationer who violates the conditions of probation. The Commonwealth has an interest in imposing effective punishment on a convicted criminal when rehabilitation is not possible. When an individual is on probation, the Commonwealth has already gone through the expense and effort of convicting him. The Commonwealth has a strong interest in being able to revoke probation in appropriate cases without having to repeat its effort. “.. . [T]he Commonwealth also has an ‘overwhelming’ interest in using all reliable evidence in revocation proceedings.” Id. at 115-16. Both the probationer and the Commonwealth “have an interest in a reliable, accurate evaluation of whether the probationer indeed violated the conditions of his probation.” Id. at 116. Thus, the Court concluded that the requirements of due process have the goal of providing an accurate determination of whether revocation is proper. The best evidence is the testimony of witnesses having personal knowledge. However, that testimony is not always available and at times it is unrealistic to expect such testimony should be offered. Thus, confrontation rights of a probationer may be denied for “good cause.” Id. 116-17. Where the Commonwealth seeks to rely on evidence not subject to cross-examination, due process requires that the proper focus be the reliability of the evidence presented. Where the evidence would be admissible under the standard evidentiary rules, it is presumptively reliable. Where hearsay is offered as evidence of the alleged violation, “the indicia of reliability must be substantial.” Id. at 118. The Commonwealth must establish both good cause for not presenting witnesses and the reliability of the hearsay offered.
The test for formulating what process is due was formulated in Goldberg v. Kelly, 397 U.S. 254: “The extent to which procedural due process must be afforded ... is influenced by the extent to which he may be ‘condemned to suffer grievous loss,’ . . . [citation omitted], and depends upon whether the . . . [individual’s] interest in avoiding that loss outweighs the governmental interest in summary adjudication.” Goldberg v. Kelly, 397 U.S. at 262-63 as quoted in Myers u. Commonwealth, 363 Mass, at 854-55. The purpose of §58A is to hold defendants who pose a substantial danger to the community. Section 58A is intended to operate only as to individuals who have been arrested for specific serious offenses. See Salerno at 750. Where the Commonwealth is seeking an order that a defendant “be committed to custody or confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentence or being held in custody pending appeal.” See G.L.c. 276, §58A(4), the liberty interest of that presumptively innocent defendant is greater than that of a probationer who has been convicted. That liberty interest is more akin to the interest of a defendant facing a probable cause hearing.
Both the defendant and the Commonwealth have an interest in an accurate determination of the issue of dangerousness. This court construes §58A(4) as requiring that, where a defendant objects to a proffer by the prosecutor, the Commonwealth must offer evidence allowed under §58A(4) through a witness or witnesses or establish “good cause” for the failure to produce testimony. Where the Commonwealth intends to rely on hearsay, the Commonwealth must, at a minimum, establish the reliability of the information proffered through a witness. A defendant who is the subject of a detention hearing who makes a timely objection to a proffer must be afforded the opportunity to cross-examine the witness who makes the proffer to test the reliability of any hearsay.
This construction is not undermined by the express language of §58A(4) concerning the rules of admissibility of evidence at a criminal trial not being applicable to the detention hearing. A review of the factors upon which the court may rely set forth in §58A(5) demonstrates that the court may consider evidence not generally admissible at a criminal trial such as a defendant’s family ties (or lack thereof), a defendant’s character and employment history, a defendant’s record of convictions, and history of violations of restraining orders or terms of bail or probation. See G.L.c. 276, §58A(5). The scope of evidence which the Commonwealth may offer is broadened. However, since a detention order results in an incarceration of a defendant who is charged with a serious offense but who is presumed innocent, the hearing must afford a defendant with a “meaningful” opportunity to be heard. A hearing consisting of a proffer by the prosecutor is not, in this court’s view, such a hearing.
Although a hearing where the Commonwealth is required to produce witnesses is more cumbersome and imposes a burden on the court, that burden was anticipated in Aime v. Commonwealth, 414 Mass, at 684. See also Myers v. Commonwealth, 363 Mass, at 856-58. To ensure that the purpose of the statute is effectuated and dangerous defendants are detained, an evidentiary hearing is required.
The defendants have objected to the procedure elected by the Commonwealth. Although §58A(4) expressly authorizes the court to continue a detention hearing for the purpose of securing a witness, the Commonwealth did not seek such a continuance. Although the Commonwealth’s proffer is compelling, it fails to satisfy constitutional requirements.
*16 Joinder
Although the defendants are brothers, the Commonwealth concedes that the defendants are charged with separate offenses which could not be joined for trial. “(T]he factfinding function of the court in a pretrial detention decision must be focused on one individual — the defendant — and the court must view that defendant as an individual.” United States v. Phillips, 732 F.Supp. 255, 264 (D.Mass 1990). They are entitled to separate hearings on the issue of bail.
ORDER
For the foregoing reasons, the defendants’ objections based upon the Commonwealth’s failure to seek a detention hearing at the defendants’ “first appearance” on these charges is OVERRULED.
Commonwealth’s motion for a detention order is DENIED. The defendants’ Motion to Strike the Commonwealth’s Proffer is ALLOWED.
The defendants are each entitled to a bail hearing pursuant to G.L.c. 276, §58.

Mr. Thomas testified before the Grand Juiy. The Grand Jury minutes were not available at the hearing on pretrial detention.

According to the prosecutor, a police report was made at that time. However, Willie Mathis appeared in district court, took the stand under oath and told the judge that that he did not wish to proceed in that case, and the case was dismissed.

In Avne v. Commonwealth, 414 Mass, at n. 18, the Court noted that, in concluding that the predecessor to §58A did not comport with federal constitutional mandates, the Court did not need to consider the constitutionality of that statute under arts. 1, 10, 12, and 26 of the Massachusetts Declaration of Rights.

The Court did not reach the issue whether preventative detention violates the Massachusetts Declaration of Rights. Aims v. Commonwealth, 414 Mass, at 681, n. 18.

 18 U.S.C. §3142(e) provides in pertinent part:
... In a case described in subsection (f)(1) of this section, a rebuttable presumption arises that no condition or combination of conditions will reasonably assure the safety of any other person and the community if such judicial officer finds that—
(1) the person has been convicted of a federal offense that is described in subsection (f)(1) of this section, or of a state or local offense that would have been an offense described in subsection (f)(1) of this section if a circumstance giving rise to federal jurisdiction had existed;
(2) the offense described in paragraph (1) of this subsection was committed while the person was on release pending trial for a federal, state, or local offense; and
(3) a period of not more than five years has elapsed since the date of conviction, or the release of the person from imprisonment, for the offense described in paragraph (1) of this subsection, whichever is later.
Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.), or an offense under section 924(c) of title 18 of the United States Code.

 In United States v. Acevedo-Ramos, 755 F.2d 203 (1st Cir. 1985), cited by the Commonwealth, the government’s “proffer” came through the testimony of the FBI agent in charge of the investigation. The agent detailed the FBI’s investigation and was cross-examined by defense counsel. The First Circuit construed the Ball Reform Act to authorize the judicial officer to base his or her decision upon “investigatory descriptions of evidence (and similar hearsay) where the judicial officer reasonably concludes that those descriptions, reports, and similar evidence, in the particular circumstances of the hearing, are reliable.” Id. at 207.