******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom ROGERS, C. J., and McDON-ALD, J., join, dissenting. As this court repeatedly has stated, the purpose of bail in this state is, and always has been, to ensure the appearance in court of a criminal defendant awaiting trial. Despite this unchallenged principle, and notwithstanding the right to bail expressly guaranteed under article first, § 8, of the Connecticut constitution,[1] the majority today holds that a defendant who concededly is not a flight risk may be held in lieu of bail solely on account of his perceived dangerousness. Because I do not agree that the state constitutional right to bail permits this form of preventive detention, I must dissent.

The majority accurately sets forth the facts and procedural history in some detail. Lost in the thicket of the procedural history of this case, however, are several key points that are necessary for a full understanding of the claim of the defendant, Francis Anderson, that the imposition of a monetary bond under the circumstances of this case deprived him of his state constitutional right to bail. First, although the defendant had been released and transferred back to the Whiting Forensic Division of Connecticut Valley Hospital (Whiting) on a promise to appear on a previous felony assault charge at the time he allegedly committed his most recent assault, the trial court did not revoke the defendant's release on the basis that he committed that assault while on pretrial release, which, under General Statutes § 54-64f (c),[2] the court was authorized to do.[3] Rather, the court imposed a monetary bond in the new case, and the defendant was transferred to the custody of the Commissioner of Correction because he could not afford to pay that bond. If the court had proceeded to revoke the defendant's release pursuant to § 54-64f, the defendant would have been entitled to an evidentiary hearing prior to the revocation, at which the state would have been required to prove by clear and convincing evidence that the safety of others would be endangered by the defendant's release. See General Statutes § 54-64f (c). Because the trial court imposed a monetary bond in the new case, however, no such hearing or proof of his dangerousness was required.

Moreover, because the defendant was committed at Whiting by virtue of his previous acquittal by reason of mental disease or defect, an order releasing him on a promise to appear—or, for that matter, any nonsurety bond—would have resulted not in his release into the community, but in his continued confinement at Whiting. Thus, as the trial court recognized, there was no risk that the defendant would fail to appear in court if released, and it is undisputed that a monetary bond was unnecessary to ensure the defendant's appearance.

Finally, the trial court's sole consideration in setting a bond in this case was its belief that the defendant posed a safety risk to other patients and hospital staff if he remained at Whiting, and the bond that the court set was intended to ensure that the defendant would be transferred from Whiting to the custody of the Commissioner of Correction. As the trial court explained, in reaching its determination, it considered the defendant's "history of violence" based on the allegations against him in the pending cases, concluding "that the defendant posed a risk to the physical safety of other people, [including] . . . not only the staff . . . working [at Whiting], but [also] . . . the other patients," and that a $100,000 monetary bond was "necessary to ensure the safety of these people." Quite clearly, then, the court imposed a monetary bond in an amount that the defendant could not pay, with the result that the defendant would be transferred from Whiting to the custody of the Commissioner of Correction, solely because the court believed that the defendant represented a threat to the staff and patients at Whiting. Furthermore, although the trial court did not order the defendant detained without bail on account of his dangerousness—an order that would have been unlawful— the undeniable purpose and effect of the court's imposition of a high monetary bond was to ensure that the defendant would be detained because of the threat he posed to the safety of others. As a result, the defendant has been preventively detained.[4]

On appeal, the defendant claims that the imposition of a monetary bond for the purpose of ensuring that he would be detained pending trial based solely on the belief that he posed a threat to public safety violates his right to bail under article first, § 8, of the Connecticut constitution. For the reasons set forth hereinafter, I agree with this contention.[5]

Article first, § 8, contains two provisions pertaining to bail in criminal cases. First, like the eighth amendment to the United States constitution, article first, § 8, of the Connecticut constitution provides that excessive bail shall not be required. Although it had been argued that the prohibition on excessive bail under the eighth amendment implies that bail may not be denied,[6] the United States Supreme Court rejected this view in *United States* v. *Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987). In that case, the respondents challenged the constitutionality of the Bail Reform Act of 1984, which authorized the pretrial detention of a defendant if, after an evidentiary hearing, the court finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] . . . and the safety of any other person and the community . . . ." Public L. No. 98-473, 98 Stat. 1976, 1978–80 (1984), codified at 18 U.S.C. § 3142 (e) and (f) (Supp. II 1984).

The respondents claimed, inter alia, that this provision violated the eighth amendment because the excessive bail clause guaranteed their right to have bail set in an amount no greater than that necessary to ensure their appearance at trial. See *United States* v. *Salerno*, supra, 752–53. The court rejected this claim, concluding that the "[e]ighth [a]mendment [does not] categorically [prohibit] the government from pursuing other admittedly compelling interests through regulation of pretrial release." Id., 753. According to the court, "[t]he only arguable substantive limitation of the [b]ail [c]lause is that the [g]overnment's proposed conditions of release or detention not be 'excessive' in light of the perceived evil. . . . Thus, when the [g]overnment has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more . . . [but] when Congress has mandated detention on the basis of a compelling interest other than prevention of flight, as it has here, the [e]ighth [a]mendment does not require release on bail."[7] (Citation omitted.) Id., 754–55.

In contrast to the eighth amendment, however, article first, § 8, of the Connecticut constitution expressly guarantees the right to bail in all but certain capital cases, providing that, "[i]n all criminal prosecutions, the accused shall have a right . . . to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great . . . ." Although we previously have not considered whether, in light of this additional protection, our state constitution prohibits the use of bail to protect public safety, we have concluded that a court may not deny bail outright except in cases falling within the exception expressly provided for in article first, § 8. See *State* v. *Menillo*, 159 Conn. 264, 269, 268 A.2d 667 (1970) ("the bail provision of § 8 of article first of our constitution makes clear that it was intended that in all cases, even capital cases not falling within the exception, bail in a reasonable amount should be ordered"). We also have recognized that the excessive bail clause of article first, § 8, "prevents a court from fixing bail in an unreasonably high amount so as to accomplish indirectly what it could not accomplish directly, that is, denying the right to bail." Id. Thus, under our constitution, "[t]he right to be released on bail upon sufficient security is a fundamental constitutional right"; *State* v. *Olds*, 171 Conn. 395, 404, 370 A.2d 969 (1976); and that right may not be denied except in the limited circumstances set forth in article first, § 8, itself. See, e.g., *State* v. *Aillon*, 164 Conn. 661, 662, 295 A.2d 666 (1972) (order) (following determination of United States Supreme Court in *Furman* v. *Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 [1972], that death penalty as then imposed nationwide was unconstitutional, defendant, who had been charged in this state with murder, a capital offense as defined by statute, was no longer "being detained

for an offense [that was] . . . punishable by death" and, therefore, was "entitled to bail and to release on entering into a recognizance, with sufficient surety, for his appearance before the court having cognizance of the three offenses with which he [was] charged").

Although the right to bail is guaranteed by our constitution, the administration of bail has long been governed by statute. The relevant procedures governing pretrial release are set forth in General Statutes § 54-64a. Prior to 1990, § 54-64a provided that, upon presentment of the defendant, the court was to release the defendant "upon the . . . [least restrictive] conditions of release found sufficient to provide reasonable assurance of his appearance in court . . . ." General Statutes (Rev. to 1989) § 54-64a. In 1990, however, the General Assembly passed bail reform legislation that, for the first time in our history, authorized courts to consider public safety concerns when setting conditions of release for certain crimes and to revoke bail when a defendant violates the conditions set by the court. See Public Acts 1990, No. 90-213, § 51; Public Acts 1990, No. 90-261, § 9. As a result of this legislation, § 54-64a now contains two distinct provisions governing the court's pretrial release decision, depending on the seriousness of the offense with which the defendant is charged.

For defendants charged with most misdemeanors, § 54-64a (a) (1) still requires the court to impose the least restrictive conditions necessary to ensure the appearance of the defendant in court, and § 54-64a (a) (2) sets forth factors relating to that purpose that the court may consider when setting conditions of release. For defendants charged with most felonies, however, § 54-64a (b) (1) now provides that "[the] court shall, in bailable offenses, promptly order the release of [the defendant] upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the [defendant] in court *and that the safety of any other person will not be endangered* . . . ." (Emphasis added.) Section 54-64a (b) (1) further enumerates the conditions that the court may set, from least restrictive to most restrictive, as follows: (1) a written promise to appear without special conditions; (2) a written promise to appear with nonfinancial conditions; (3) a bond without surety in no greater amount than necessary; and (4) a bond with surety in no greater amount than necessary. Section 54-64a (b) (2) sets forth certain factors that the court may consider in determining what conditions will ensure the defendant's appearance and the safety of other persons. In addition to identifying factors relevant to ensuring the appearance of the defendant, § 54-64a (b) (2) also authorizes the court to consider "[1] the number and seriousness of charges pending against the [defendant] . . . [2] the [defendant's] history of violence, [3] whether the [defendant] has previously been convicted of similar offenses

while released on bond, and [4] the likelihood based upon the expressed intention of the [defendant] that [the defendant] will commit another crime while released." General Statutes § 54-64a (b) (2) (H), (J), (K) and (L). Finally, § 54-64a (b) (3) requires the court to "state for the record any factors . . . that it considered and the findings that it made as to the danger, if any, that the [defendant] might pose to the safety of any other person upon the [defendant's] release that caused the court to impose the specific conditions of release that it imposed." Thus, when a court sets conditions of release for persons charged with most felonies, § 54-64a (b) expressly instructs it to consider the safety of other persons and authorizes it to consider the likelihood that the defendant will commit another crime if released.[8]

On the basis of this statutory language, the trial court in the present case determined that, although a monetary bond was not necessary to ensure the defendant's appearance in court, § 54-64a (b) (1) nevertheless authorized it to set a monetary bond for the purpose of ensuring the safety of other persons. The defendant claims, however, that courts may not set financial conditions of release solely to protect public safety. Rather, the defendant contends, the purpose of bail under the Connecticut constitution is to ensure the appearance of the accused, and the right to be released "upon sufficient security" pursuant to article first, § 8, mandates that a trial court may set a monetary bond only in an amount necessary to effectuate that end.[9] The defendant maintains that, because the trial court set a monetary bond solely to protect the safety of Whiting patients and staff by ensuring that he would be detained pending trial, the imposition of a monetary bond in this case violated his right to bail under article first, § 8.

We last examined the purposes of bail in *State* v. *Ayala*, 222 Conn. 331, 610 A.2d 1162 (1992), which presented the issue of whether article first, § 8, precludes courts from revoking a defendant's bail for violating nonfinancial conditions of release. In *Ayala*, the defendant, Enrique Ayala, was arrested on several felony charges. See id., 335. Ayala initially posted the monetary bond set by the court and was released subject to certain conditions, one of which was that he not commit any crime while on release. Id. Shortly after his release on bond, Ayala was charged with second degree assault, and, two days later, he was charged with threatening. Id. Although he again was released on bond in those cases, the state sought to revoke his bond in the first case, claiming that revocation was warranted under § 54-64f because he had committed crimes in violation of the conditions of his release. Id., 335–36. After a hearing, the trial court found probable cause to believe that Ayala had committed a crime while he was released on bond, and also found by clear and convincing evidence that the safety of another person, namely, the

victim in the assault case, would be endangered if Ayala were to be released. Id., 337. Accordingly, in reliance on § 54-64f (c), the court revoked Ayala's bond in the first case. Id.

On appeal, Ayala claimed, inter alia, that the right to bail under article first, § 8, prohibited the court from revoking his bail without setting a new bond. See id., 342. We rejected that claim, explaining that "[t]he fundamental right to bail guaranteed under our state constitution must be qualified by a court's authority to ensure compliance with the conditions of release"; id., 347; and that, "[w]hile released on bail prior to trial, a defendant is still within the constructive custody of the law. *State* v. *Bates*, 140 Conn. 326, 330–31, 99 A.2d 133 (1953). The trial court retains jurisdiction over the conditions of release . . . and possesses the inherent authority to exercise powers; to implement and enforce laws; to exact obedience." (Citations omitted; internal quotation marks omitted.) *State* v. *Ayala*, supra, 222 Conn. 347. We further explained that Ayala's "failure to abide by the conditions of his release resulted in a forfeiture of his right to release"; id., 348; and that, "[b]ecause [Ayala] was initially released on bail, the requirements of article first, § 8 . . . were met." Id., 348–49. We also expressly observed that this conclusion was "not inconsistent with our statement in *State* v. *Menillo*, supra, [159 Conn.] 269, that the fundamental purpose of bail is to ensure the presence of an accused throughout all proceedings." (Internal quotation marks omitted.) *State* v. *Ayala*, supra, 349. As we explained, the revocation of a defendant's bail for the commission of an offense while he is on release is consistent with the purpose of ensuring the defendant's appearance because "[i]t is reasonable to suppose that a defendant who is arrested and charged with the commission of additional and serious crimes while on pretrial release might, as a result of these charges, more readily be tempted to flee the jurisdiction." Id.; see also *Mello* v. *Superior Court*, 117 R.I. 578, 582, 370 A.2d 1262 (1977) ("When one free on bail commits other crimes, the pressure to flee the court's jurisdiction and fail to appear when summoned is apt to increase. Thus, bail may also be conditioned on the continuing good behavior of the accused.").

In addressing Ayala's argument that the revocation of his bail based on the commission of a crime conflicted with the fundamental purpose of bail under the state constitution, we also looked to the history of the right to bail in Connecticut. See *State* v. *Ayala*, supra, 222 Conn. 349–51. We noted that, prior to the adoption of the right to bail provision in the 1818 constitution,[10] the right to be admitted to bail was protected by statute as early as 1672, and was incorporated into the 1750 revision of the statutory declaration of rights.[11] Id., 350. The relevant provision of the 1750 declaration of rights provided that "no man's person shall be restrained, or imprisoned, by any authority whatsoever, before the

law hath sentenced him thereunto, if he can and will give sufficient security, bail, or mainprize for his appearance *and good behaviour in the mean time*, unless it be for capital crimes, contempt in open court, or in such cases wherein some express law doth allow of, or order the same." (Emphasis added.) Public Statute Laws of the State of Connecticut (1808) tit. I, § 4, p. 24. We explained that this language suggests that courts had the authority to ensure the good behavior of defendants who were released on bail pending trial. See *State* v. *Ayala*, supra, 351. We observed that "[n]either the text of the 1818 constitution nor that of any subsequent constitution has made express reference in its bail provision to the defendant's appearance or to the defendant's good behavior"; (footnote omitted) id., 350–51; and that "[l]egislative references to either purpose were eliminated from statutes enacted after 1818 and before 1849 . . . ." Id., 351. We also indicated, however, that, although "language providing that bail was conditioned [on] a defendant's appearance before the court reappeared in statutes enacted in [1849][12] and remained thereafter . . . [t]here [was] no evidence . . . that the framers of the 1818 constitution intended to abandon the customary purposes of bail that were in effect at the time of the adoption of the [1818] constitution . . . ." (Footnote added.) Id. On the basis of our understanding of this history, we observed that, "while ensuring the appearance of the defendant is a *primary* purpose of bail in this state, it is not necessarily the sole purpose"; (emphasis in original) id., 350; and that, by permitting trial courts to impose nonfinancial conditions of release, the legislature recognized the court's authority to regulate and monitor the conduct of defendants who have been released into the community pending trial. See id., 349–51.

In *Ayala*, although we did not have occasion to consider whether a trial court may set a monetary bond as a means of detaining a dangerous defendant solely in the interest of public safety, we strongly suggested that courts are not authorized to set financial conditions of release for that purpose. See id., 351. Rather, we explained that "[c]onditioning pretrial release on a defendant's ability to meet a financial bond set by the court emphasizes the appearance aspect of bond," whereas "[t]he use of nonfinancial conditions of release in addition to or in lieu of bond has broadened the focus of the purposes of bail to recognize . . . that bail is a method for ensuring a defendant's good behavior *while on release*." (Emphasis added.) Id. In other words, a trial court, pursuant to its authority over a defendant who has been released on bail, also may impose nonfinancial conditions to ensure the defendant's good behavior while he is awaiting trial, and the court may enforce such conditions by revoking bail in the event that the defendant fails to comply with them. This does not mean, however, that a court may set a monetary

bond to prevent a defendant from obtaining release in the first instance predicated on the concern that he poses a danger to the public. Indeed, in agreeing with the reasoning of the court in *Mello* v. *Superior Court*, supra, 117 R.I. 585, we indicated in *Ayala* that our holding should not be interpreted as authorizing the detention of a defendant on the basis of public safety concerns alone. See *State* v. *Ayala*, supra, 222 Conn. 352. We explained that "[t]he authority . . . to revoke bail in certain situations [should not] be construed as [sanctioning the] authority to exercise preventive detention. The former is a sanction for past acts, [whereas] the latter [is] a prophylactic for the future." (Internal quotation marks omitted.) Id., quoting *Mello* v. *Superior Court*, supra, 585.

Moreover, the history of the right to bail in Connecticut belies any claim that our constitution allows courts to set financial conditions of release as a means of detaining a defendant for the protection of the public. That history reveals, rather, that the sole legitimate purpose for requiring a defendant to post a monetary bond before being admitted to bail is to ensure his appearance in court.[13] We previously have recognized that the 1818 constitution, and the declaration of rights contained in article first of that constitution in particular, did not establish new or additional rights but, rather, incorporated into our founding document certain fundamental rights that already were protected by statute or the common law. See, e.g., *Dowe* v. *Egan*, 133 Conn. 112, 119, 48 A.2d 735 (1946); see also W. Horton, The Connecticut State Constitution (2d Ed. 2012) pp. 3–4; C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 96 (1982). Consistent with this view, when interpreting provisions of our constitution, we have observed that, "[t]o understand the intent of the instrument it is often necessary to have recourse to the form of government as it had existed before, and did exist at the time of, the adoption of the [1818] constitution." *Dowe* v. *Egan*, supra, 119; see, e.g., *State* v. *Stoddard*, 206 Conn. 157, 164–65, 537 A.2d 446 (1988) (reviewing history of right to counsel in Connecticut in concluding that state constitution requires that suspect in custody be informed of efforts by counsel to render legal assistance). Thus, in determining whether the right to be released on "sufficient sureties" within the meaning of article first, § 14, of the 1818 constitution; see footnote 10 of this opinion; included the right to a monetary bond in an amount no more than necessary to ensure the defendant's appearance, we must examine the statutes and case law leading up to the adoption of the 1818 constitution to ascertain the purpose of bail as it was understood at that time.

Significantly, statutory provisions enacted both before and immediately after the adoption of the 1818 constitution suggest that the purpose of bail was to

ensure the appearance of the accused, and that bail should be set in an amount necessary to effectuate that purpose. For example, a statutory provision passed in 1784 authorizing justices of the peace to set bail in criminal matters "not determinable by a single minister of justice" indicated that "such [justices of the peace] shall recognize with surety, such person or persons, if bailable, *to appear before the court* proper to try and determine the [matter]: and for want of sufficient bail to commit him or them to gaol, *for the purpose afore-said* . . . ." (Emphasis added.) Public Statute Laws of the State of Connecticut (1808) tit. XLVI, c. I, § 3, p. 230. Thus, justices of the peace were to set bail in an amount necessary to ensure the defendant's appearance, and a person who could not post bail was detained so that he could be brought to appear before the court in which the matter would be tried. This provision was carried over in substantially similar form when the statutes were rewritten and reenacted following the adoption of the 1818 constitution. See Public Statute Laws of the State of Connecticut (1821) tit. 22, § 99, p. 172. In the chapter of the 1821 statutes setting forth the powers of the justices of the peace, another provision provided that justices of the peace "may order the defendant to give bond, or to enter into a recognizance, with sufficient surety . . . *conditioned that the defendant appear before the court having cognizance of the offence* . . . ." (Emphasis added.) Public Statute Laws of the State of Connecticut (1821) tit. 21, § 35, p. 147. The provisions contained in the 1821 statutes shed considerable light on the meaning of the 1818 constitution because the committee appointed to revise the statutes following the adoption of the 1818 constitution was instructed "to examine the statute laws, and to recommend such alterations and provisions as should be necessary and expedient to render the statutes conformable to the constitution." Public Statute Laws of the State of Connecticut (1821) p. viii. Consequently, the 1821 statutes provide an indication of how the constitutional provisions were understood at that time. Notably, there is no indication in either the pre-1818 or post-1818 statutes that courts were authorized to set a monetary bond to protect the public from a defendant perceived to pose a safety risk.

Although there is no case law at or around the time of the adoption of the 1818 constitution that squarely addresses the issue, several cases from that time support the view that the purpose of bail was to ensure the appearance of the defendant. For example, in *Dickinson* v. *Kingsbury*, 2 Day (Conn.) 1 (1805), in which this court, in a memorandum decision, held that a sheriff may take bail from a defendant who could not post bail at the time he was put to plea, the court reasoned that "[t]he personal liberty of the subject is to be favored, as far as practicable and safe, until conviction. *Bail for his appearance* at the court, in which his guilt or

innocence is to be tried, is, at once, the mode of favoring liberty, *and securing the appearance for trial.*" (Emphasis added.) Id., 11 (reporter's summary of case). Subsequently, in *Potter* v. *Kingsbury*, 4 Day (Conn.) 98 (1809), this court held that a justice of the peace conducting an inquiry into whether there was probable cause to bind a defendant over for trial had the authority to adjourn court for the purpose of allowing the state or the defendant to obtain witnesses, and to "commit [a defendant] to gaol for safe-keeping, unless he offers bail for his appearance . . . ." (Citation omitted.) Id., 99. In so holding, the court noted that, if the defendant offered bail, "it [became] the duty of the justice of the peace to take bail, if good and sufficient be offered, *for the appearance of the* [*defendant*]." (Emphasis added.) Id. In expounding on the purpose of bail, the court further explained that "[the power to take bail] will not only give a reasonable opportunity to persons prosecuted for offenses to prepare for their defense, but will save them from imprisonment. Justices of the peace, however, in the exercise of this power, should take bonds *sufficient to enforce an appearance of the* [*defendant*], according to the nature and enormity of the offense." (Emphasis added.) Id., 100.

In sum, contemporaneous statutes and case law indicate that, when the 1818 constitution was adopted, it was well understood that the sole purpose of bail was to ensure the appearance of the defendant. As one author put it in a comment containing an in-depth review of the history of bail in Connecticut that was published just after the enactment of the 1990 bail reform legislation, "[t]he only permissible object of bail since 1818 has been to assure a defendant's appearance before the court at a later date. . . . [T]he meaning of bail established in the state constitution not only refers to the right of those accused of noncapital offenses to be released before trial, but also to the notion that the only valid state interest in conditioning the accused's release is assuring his appearance before the court." M. Mann, comment, "Overlooking the Constitution: The Problem With Connecticut's Bail Reforms," 24 Conn. L. Rev. 915, 941 (1992).

This understanding is consistent with the common-law origins of our bail system. Cf. *State* v. *Joyner*, 225 Conn. 450, 489, 625 A.2d 791 (1993) (*Berdon, J.*, dissenting) ("it is clear that in the colonial days and into the time of [Zephaniah] Swift's writings, Connecticut jurists relied [on William] Blackstone as a source of the common law"); *State* v. *Geisler*, 222 Conn. 672, 687–88, 610 A.2d 1225 (1992) (discussing English common law in course of deciding scope of protections under article first, § 7, of Connecticut constitution). Under English common law, a "bail" was a person who promised to ensure that the accused would appear before the court, and, upon such promise, the accused would be "delivered . . . into the custody of his bail, to be forthcoming

at a certain day, and [was] therefore said to be a surety of body . . . for an appearance . . . ." (Internal quotation marks omitted.) A. Highmore, A Digest of the Doctrine of Bail; In Civil and Criminal Cases (1783) pp. v–vi. If the accused failed to appear, the bail would become liable for the amount of the bond. Id., pp. 200–201; see also P. Rice, "Bail and the Administration of Bail in the State of Connecticut," 4 Conn. L. Rev. 1, 1 (1971). As Blackstone explained, when a justice of the peace found that there was just cause to bind an accused for trial for an offense, the accused was required "either [to] be committed to prison, or [to] give bail; that is, put in *securities for his appearance*, to answer the charge against him. This commitment, therefore, being only for safe custody, wherever bail will answer the same intention, it ought to be taken . . . ." (Emphasis added.) 4 W. Blackstone, Commentaries on the Laws of England (1807) p. 296. A 1783 treatise on the law of bail in England noted that justices of the peace should set bail in an amount "sufficient to prevent the offender's absconding"; A. Highmore, supra, p. 194; and "must take care that, under preten[se] of demanding sufficient surety, they do not make so excessive a demand as in effect amounts to a denial of bail . . . ." Id., p. 196.

Although bail generally was denied in capital cases, there is no suggestion that this was due to concerns over the dangerousness of the accused. To the contrary, these authorities make clear that bail was not allowed in capital cases because a person charged with a capital offense would be more likely to flee than to appear and stand trial, and it was believed that "the public [was] entitled to demand nothing less than the highest security that can be given, [namely, in the form of] the body of the accused; in order to ensure that justice shall be done upon him, if guilty. Such persons therefore . . . have no other sureties but the four walls of the prison." 4 W. Blackstone, supra, p. 298; see also id., pp. 296–97 ("[I]n . . . offences of a capital nature, no bail can be a security equivalent to the actual custody of the person. For what is there that a man may not be induced to forfeit, to save his own life?"); L. Tribe, "An Ounce of Detention: Preventive Justice in the World of John Mitchell," 56 Va. L. Rev. 371, 401 (1970) (explaining that "the underlying assumption seems to have been that certain classes of offenders, particularly those whose lives were at stake, ought to be detained simply to assure their presence at trial," both because of "the greater temptation to flee" and "the fear that persons guilty of especially atrocious offenses might well be killed before they could appear for trial").

That the right to bail under article first, § 8, prohibits courts from setting a bond solely on the basis of a defendant's perceived dangerousness is further evidenced by the consistency with which our legislature and courts have indicated that bail is to be conditioned

on the appearance of the defendant. "A practical construction placed [on] a constitutional provision immediately after its adoption and consistently and repeatedly followed by the executive and legislative branches for over [one] century thereafter is most persuasive . . . [and] furnishes strong evidence of the meaning to be accorded the [provision]. A practice of such duration, while not absolutely binding, is entitled to great regard in determining the true construction of the constitutional provision." (Citation omitted.) *Cahill* v. *Leopold*, 141 Conn. 1, 14, 103 A.2d 818 (1954). As I discussed previously, statutes governing the administration of bail have provided for the setting of a bond to ensure the defendant's appearance since at least 1784. In 1849, the statute implementing the right to bail in criminal cases expressly provided that "[a]ll persons detained in jail for trial, for an offence not capital, shall be entitled to bail *for their appearance* before the court having cognizance of the offence . . . ." (Emphasis added.) Revised Statutes of the State of Connecticut (1849) tit. VI, c. XII, § 163, p. 259. Just two years after the adoption of the Connecticut constitution of 1965, the legislature amended the bail statutes to allow for release on a written promise to appear in lieu of a monetary bond, and provided that the accused must be released upon the imposition of the least restrictive conditions sufficient "to provide reasonable assurance of his appearance in court . . . ."[14] Public Acts 1967, No. 549, § 12, codified at General Statutes (Rev. to 1968) § 54-64a. Although Connecticut's bail statutes have been amended several times throughout the state's history, language providing that bail must be set solely in order to ensure the defendant's appearance remained in effect until the 1990 bail reform effort resulted in the current language. Indeed, for more than 150 years after the adoption of the 1818 constitution, no Connecticut statute authorized a court to consider public safety in determining whether to release a defendant on bail until the current language was added in 1990. The long history of legislative enactments requiring courts to set bail to ensure the appearance of the accused, and the absence of any language suggesting that courts may consider public safety concerns when setting bail, provides support for the conclusion that the state constitutional right to bail cannot be squared with the imposition of a monetary bond solely for the purpose of detaining a defendant on the ground that he poses a danger to others.

Of course, this court also has expressed the view that the purpose of requiring a monetary bond is to ensure the appearance of the accused. As I previously noted, in *State* v. *Menillo*, supra, 159 Conn. 265, this court stated that "[t]he fundamental purpose of bail is to ensure the presence of the accused throughout all proceedings, including final judgment." Id., 269. In explaining that the excessive bail clause of article first,

§ 8, prevents a court from circumventing the right to bail by setting an unreasonably high bond, the court also indicated that, although "a reasonable amount is not necessarily an amount within the power of the accused to raise," the bond must be "reasonable under all the circumstances relevant to the *likelihood that the accused will flee the jurisdiction or otherwise avoid being present for trial*." (Emphasis added.) Id.

In *State* v. *Bates*, supra, 140 Conn. 326, this court, in the course of addressing whether a person who is released on bail is considered in custody such that his failure to deny an accusation of guilt may not be admitted against him as an adoptive admission,[15] indicated that "[t]he object of requiring bail is to compel the presence of [the] defendant in court, to the end that justice may be administered. . . . Its purpose is to secure [at trial] the presence of the person charged with [a] crime . . . and to force him to submit to the jurisdiction and the punishment imposed by the court." (Citation omitted; internal quotation marks omitted.) Id., 330; see also *State* v. *Hedge*, 297 Conn. 621, 671–72, 1 A.3d 621 (2010) (in prosecution for failure to appear in violation of condition of bail, evidence that defendant was free on bond, that bond was forfeited, and that defendant was rearrested after failing to return to court was deemed sufficient to support inference that appearance in court was term of bond because "it is a matter of common knowledge that bonds and bail are posted as a condition of release for the purpose of ensuring the presence of an accused for all court proceedings pertaining to the charged offense"); cf. *State* v. *Sheriff*, 301 Conn. 617, 626, 21 A.3d 808 (2011) (when accused released on bond fails to appear, surety may be discharged "only when appearance at trial is made impossible by an act of God, an act of the state, or pursuant to law" because, "[b]y posting bond for the accused, the surety willingly takes custody of the accused in place of the state and *insures the state against the risk of flight* by accepting responsibility for the consequences thereof" [emphasis added]). Throughout the history of Connecticut jurisprudence, there is not a single case in which a Connecticut court has indicated that a monetary bond may be set in a criminal case for the purpose of protecting public safety.

This long held view of the purpose of bail carries additional weight in light of the fact that the framers of the 1965 constitution adopted article first, § 8, without any indication that they intended to depart from this state's prior understanding of the right to bail. Although we generally have focused on how constitutional provisions were understood in 1818 when interpreting those provisions that were readopted in similar or identical form in the 1965 constitution; see, e.g., *State* v. *Lamme*, 216 Conn. 172, 178–81, 579 A.2d 484 (1990); we occasionally have looked to the state of the law in 1965 to understand how protections contained in the

declaration of rights were understood by the framers of the 1965 constitution. See, e.g., *Ryszkiewicz* v. *New Britain*, 193 Conn. 589, 598, 479 A.2d 793 (1984) (concluding that provision in city charter limiting municipal liability does not infringe right to access courts under article first, § 10, because, "[g]iven that governmental immunity was a well established judicial principle at the time of the Connecticut constitution's adoption in 1818 and in 1965, the provision granting access to courts for redress of grievances found in article first, § 10, cannot be construed as granting an unqualified right to recover unlimited damages from government entities"); see also W. Horton, supra, p. 34 ("[t]he more logical approach . . . would assume that the framers [of the 1818 constitution] intended continuity, not disruption, and thus that they intended for the 1818 provisions reenacted in 1965 to continue to mean what they had come to mean by 1965"). As already demonstrated, when the 1965 constitution was adopted, it was long understood in Connecticut that the essential purpose of bail was to ensure the appearance of the accused.

It also bears noting that the 1965 constitution was adopted amidst a nationwide push for bail reform, during which the constitutionality of preventive detention was the subject of active and widespread debate. See D. Freed & P. Wald, Bail in the United States: 1964, pp. vii–viii, 9–21 (discussing initiatives aimed at reforming bail system and reviewing studies concerning bail systems in various jurisdictions published between 1924 and 1963); C. Foote, "The Coming Constitutional Crisis In Bail: I," 113 U. Pa. L. Rev. 959, 961–65 (1965) (discussing efforts to reform bail system). Shortly before the adoption of the 1965 constitution, the Department of Justice sponsored the National Conference on Bail Reform and Criminal Justice, a highly publicized effort aimed at addressing deficiencies in the bail system. See Proceedings and Interim Report of the National Conference on Bail and Criminal Justice (April, 1965) pp. xiii–xvii. One of the chief concerns addressed by the conference was the propriety of using a high monetary bond as a means of detaining defendants prior to trial, and the resulting report indicated that "[a] substantial body of opinion supports the view that setting high bail to detain dangerous offenders is unconstitutional." Id., p. xxix. A short time later, the American Bar Association issued proposed standards for the administration of bail, which provide in relevant part that "[t]he sole purpose of money bail is to assure the defendant's appearance. Money bail should not be set to punish or frighten the defendant, to placate public opinion or to prevent anticipated criminal conduct." Project on Minimum Standards for Criminal Justice: Standards Relating to Pretrial Release (A.B.A., Approved Draft 1968) § 5.3 (b), p. 58; see also id., § 1.2 (c), p. 26 ("money bail . . . should be required only in cases in which no other condition will reasonably ensure the defendant's

appearance"). The introduction to the standards explains that purposely setting bail beyond the defendant's reach is "generally regarded as a distortion of the bail system" and that "only confusion and dissatisfaction can result from attempting to twist the bail system in order to prevent crime." Id., p. 6.

Around the same time, federal courts expressed the view that setting bail for the purpose of preventing the accused from committing additional crimes was contrary to the purpose of bail under the eighth amendment to the United States constitution. In 1950, Justice Robert H. Jackson, acting as a Circuit Justice in connection with an application by the government to revoke the bail of several members of the Communist Party whose convictions for conspiring to overthrow the government had been upheld by the Second Circuit Court of Appeals, rejected the government's contention that bail should be revoked because the defendants posed a danger to the public as "difficult to reconcile with traditional American law . . . ." *Williamson* v. *United States*, 184 F.2d 280, 282 (2d Cir. 1950). As Justice Jackson wrote, "[i]mprisonment to protect society from predicted but unconsummated offenses is so unprecedented in this country and so fraught with danger of excesses and injustice that I am loath to resort to it, even as a discretionary judicial technique to supplement conviction of such offenses as those of which defendants stand convicted." Id., 282–83. A little more than one year later, the United States Supreme Court concluded that bail set at $50,000 for twelve petitioners charged with conspiring to overthrow the government was excessive under the eighth amendment in light of the lack of evidence tending to show that the petitioners were a flight risk. See *Stack* v. *Boyle*, 342 U.S. 1, 3, 5–6, 72 S. Ct. 1, 96 L. Ed. 3 (1951). The court noted that "[t]he right to release before trial is conditioned [on] the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty"; id., 4; and that "[b]ail set at a figure higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the [e]ighth [a]mendment." Id., 5. Justice Jackson wrote separately and emphasized that, although he disagreed with the court's disposition of the case on procedural grounds, the government's argument that bail may be "fixed not as a reasonable assurance of [a defendant's] presence at the trial, but also as an assurance [that he] would remain in jail" was "contrary to the whole policy and philosophy of bail." Id., 10 (Jackson, J.). Against this backdrop, the fact that the framers of the 1965 constitution retained the right to bail without any suggestion that bail may be used as a means of detaining a defendant on grounds of dangerousness suggests that they intended to maintain the understanding of the purpose of bail that had been embedded in Connecticut law for close to two centuries.

Courts in other jurisdictions with state constitutional right to bail provisions similar or identical to our own also have concluded that the purpose of bail is to ensure the appearance of the accused and that preventive detention, either by the outright denial of bail or by setting a prohibitively high monetary bond, is not constitutionally permissible. As this court previously has observed, it appears that the declaration of rights adopted in 1818 has its antecedents in the Mississippi constitution of 1817. E.g., *State* v. *Jenkins*, 298 Conn. 209, 267, 3 A.3d 806 (2010). Thus, case law interpreting the Mississippi constitution's declaration of rights may be particularly persuasive when we interpret similar provisions in our own constitution. With respect to the right to bail, the corresponding provision in the Mississippi constitution of 1817 is identical in all material respects to the provision that the framers of our 1818 constitution adopted. Compare Conn. Const. (1818), art. I, § 14 ("[a]ll prisoners shall, before conviction, be bailable by sufficient sureties, except for capital offences, where the proof is evident, or the presumption great"), with Miss. Const. (1817), art. I, § 17 ("all prisoners shall, before conviction, be bailable by sufficient securities, except for capital offences, when the proof is evident or the presumption great"). Significantly, the Supreme Court of Mississippi has stated unequivocally that "the very purpose of bail is to [e]nsure the accused's appearance"; *Ex parte Dennis*, 334 So. 2d 369, 371 (Miss. 1976); and that, "[s]ince the purpose of allowing bail is to secure the presence of the accused at trial, the amount of bail to be required is governed largely by the character of the offense committed and the financial ability of the accused." *Royalty* v. *State*, 235 So. 2d 718, 720 (Miss. 1970);[16] see also *In re Underwood*, 9 Cal. 3d 345, 348, 508 P.2d 721, 107 Cal. Rptr. 401 (1973) ("The purpose of bail is to assure the defendant's attendance in court when his presence is required . . . . Bail is not a means for punishing defendants . . . nor for protecting the public safety." [Citations omitted.]), abrogated by 1982 amendment to Cal. Const., art. I, § 12; *Commonwealth* v. *Truesdale*, 449 Pa. 325, 338–39, 296 A.2d 829 (1972) ("Bail was conceived as a means of securing the accused's presence at trial, while at the same time according him liberty prior to trial so he could prepare his case. The traditional decision to deny bail [in capital cases] was not a means of keeping an accused confined to protect the public, it was a means of assuring he would appear at trial."), abrogated by 1998 amendment to Pa. Const., art. I, § 14; *State* v. *Pray*, 133 Vt. 537, 541–42, 346 A.2d 227 (1975) ("[t]he purpose of bail, as presently constitutionally mandated, is to assure the defendant's attendance in court, and cannot be a means of punishing the defendant, nor of protecting the public"), abrogated by 1994 amendment to Vt. Const. c. II, § 40; *Saunders* v. *Hornecker*, 344 P.3d 771, 780–81 (Wyo. 2015) ("the purpose of bail in Wyoming

is to ensure the defendant's presence to answer the charges without excessively restricting the defendant's liberty pending trial" [emphasis omitted]).[17]

In accord with this view, courts in several states have concluded that their respective constitutions do not allow the use of financial conditions of release as a means of ensuring that a defendant remains detained pending trial. For example, in *People ex rel. Sammons* v. *Snow*, 340 Ill. 464, 173 N.E. 8 (1930), the petitioner was charged with vagrancy but had a history of convictions for violent offenses, as well as pending indictments for other offenses. Id., 465–66, 468. The trial court set bail at $50,000, indicating that the purpose was to ensure that the petitioner could not obtain release. Id., 469. On appeal, the Illinois Supreme Court concluded that setting bail for purposes of preventive detention violated the right to bail under the Illinois constitution:[18] "[The petitioner's criminal] record may be taken into consideration in fixing the amount of bail which would be reasonably sufficient to [e]nsure his attendance to answer this comparatively minor charge. But bail to answer this charge cannot be fixed with reference to securing his appearance to answer [for] the other crimes with which he is charged, or at an unreasonable amount for this charge, merely to detain and imprison him. His record, his character and his criminal activities and tendencies may well be taken into account to increase the amount of bail which should be required of him over that which would be required of an ordinary offender but do not justify fixing the bail on this charge of vagrancy for the purpose of keeping him in jail. . . . The amount of $50,000 could have no other purpose than to make it impossible for him to give the bail and to detain him in custody, and is unreasonable."[19] Id., 468–69.

The Supreme Court of Missouri came to the same conclusion in *State ex rel. Corella* v. *Miles*, 303 Mo. 648, 262 S.W. 364 (1924). At that time, the Missouri constitutional provisions guaranteeing the right to bail and prohibiting excessive bail were essentially identical to that of our 1818 constitution. Compare Mo. Const. (1875), art. II, §§ 24[20] and 25,[21] with Conn. Const. (1818), art. I, §§ 13 and 14. Relying on both provisions of the Missouri constitution, the Supreme Court of Missouri recognized that "[t]he purpose of giving bonds is to secure the appearance of the defendant at trial, and when the [c]onstitution forbids excessive bail it means that bail shall not be more than necessary to secure that attendance." *State ex rel. Corella* v. *Miles*, supra, 651. "Since the only purpose of bond is to secure the appearance of the defendant at the trial, any bail fixed at more than is necessary to secure that appearance is excessive within the meaning of [the constitutional prohibition on excessive bail]." Id., 651–52. The court further observed that "[t]he bail bond must be fixed with a view to giving the prisoner his liberty, not for

the purpose of keeping him in jail. If, in order to keep him in custody, the bond is ordered at a sum so large that the prisoner cannot furnish it the order violates [the right to bail under the Missouri constitution]. For that is saying the offense is not bailable when the [c]onstitution says it is."[22] Id., 652; see also *Gusick* v. *Boies*, 72 Ariz. 233, 235, 236, 238, 233 P.2d 446 (1951) (concluding that $150,000 bail for defendant charged with sodomy and fellatio violated state constitutional provisions guaranteeing right to bail and prohibiting excessive bail, noting that "any bail fixed at more than is necessary to secure [the defendant's] appearance is excessive within the meaning of the [Arizona] constitution . . . [and] excessive bail is not to be required for the purpose of preventing the prisoner from being admitted to bail" [citation omitted]); *State ex rel. Hemby* v. *O'Steen*, 559 S.W.2d 340, 341, 342 (Tenn. Crim. App. 1977) (although trial court set bail at $25,000 and declined to reduce bail because defendant was "threat to his family, and to society, particularly while under the influence of alcohol," Court of Criminal Appeals concluded that bail was excessive under circumstances, noting that defendant was "confined nearly three months due to his inability to secure bail," which was "tantamount to a denial of bail"); *Simms* v. *Oedekoven*, 839 P.2d 381, 385 (Wyo. 1992) (concluding that Wyoming constitution does not permit denial of bail or setting of bail high enough to ensure that defendant remains detained because "either course would violate the provisions of . . . the Wyoming [c]onstitution [which guarantees the right to bail]").[23]

Finally, it is highly questionable whether the legislature, in amending § 54-64a, intended to authorize courts to set a monetary bond as a means of detaining a defendant solely on the basis of public safety concerns. As I noted previously, when the United States Supreme Court concluded in *Salerno* that the preventive detention scheme established by the federal Bail Reform Act of 1984 (act) did not violate substantive due process, the court emphasized that, because of the procedures required before a defendant may be detained under the act, including the requirement that the government prove by clear and convincing evidence that no conditions of release could adequately protect the safety of the public; see 18 U.S.C. § 3142 (e) and (f) (Supp. II 1984); the act was sufficiently narrowly tailored to further the government's compelling interest in preventing crime by arrestees. See *United States* v. *Salerno*, supra, 481 U.S. 751 ("When the [g]overnment proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, we believe that, consistent with the [d]ue [p]rocess [c]lause, a court may disable the arrestee from executing that threat. Under these circumstances, we cannot categorically state that pretrial detention offends some principle of justice so rooted in the tradi-

tions and conscience of our people as to be ranked as fundamental." [Internal quotation marks omitted.]). Thus, it seems quite clear that, under the due process clause of the fourteenth amendment, "[a] [s]tate may not enact [preventive] detention schemes without providing safeguards similar to those [that] Congress incorporated into the [act]." *Aime* v. *Commonwealth*, 414 Mass. 667, 680, 611 N.E.2d 204 (1993); cf. *Foucha* v. *Louisiana*, 504 U.S. 71, 81, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (concluding that Louisiana statutory scheme allowing continued confinement of insanity acquitee who no longer suffers from mental illness violates due process because, "[u]nlike the sharply focused scheme at issue in *Salerno*, the Louisiana scheme of confinement [was] not carefully limited").

In Connecticut, the bail reform legislation that resulted in the current version of § 54-64a was enacted just three years after the United States Supreme Court issued its opinion in *Salerno*. Nevertheless, in authorizing courts to set conditions of release for public safety purposes, the General Assembly did not provide for any procedural protections comparable to those that the United States Supreme Court had relied on in upholding the constitutionality of the act. Our legislature did, however, provide for similar protections before a court may revoke the bail of a defendant who violates the conditions of his release, as authorized by this court in *State* v. *Ayala*, supra, 222 Conn. 346–50. See General Statutes § 54-64f (b) (requiring state to prove by clear and convincing evidence that safety of any other person is endangered before court may revoke release). The inference to be drawn from this legislative action is clear: cognizant of the due process requirements enunciated in *Salerno*, the legislature did not intend or anticipate that courts would use a monetary bond as a means of detaining a defendant deemed to pose a risk to public safety. It is apparent, rather, that, in requiring the release of a defendant on conditions "found sufficient to reasonably ensure the appearance of the [defendant] in court and that the safety of any other person will not be endangered"; General Statutes § 54-64a (b) (1); the legislature contemplated that courts would set a monetary bond if necessary to ensure the defendant's appearance but would use only *nonfinancial* conditions of release for the purpose of ensuring the safety of others. Indeed, any other conclusion would require the presumption that, in enacting § 54-64a (b) (1), the legislature simply chose to ignore the federal due process protections required under *Salerno* in the case of an arrestee who, like the defendant in the present case, is detained solely on the ground that he poses a danger to others. Obviously, that would be a wholly inappropriate and unjustifiable assumption. See, e.g., *Castagno* v. *Wholean*, 239 Conn. 336, 344–45, 684 A.2d 1181 (1996) ("[Because we] read statutes to avoid, rather than to create, constitutional questions . . . [we] are bound

to assume that the legislature intended, in enacting a particular law, to achieve its purpose in a manner [that] is both effective and constitutional. . . . [T]his presumption of constitutionality imposes [on] . . . this court . . . the duty to construe statutes, whenever possible, in a manner that comports with constitutional safeguards of liberty." [Citations omitted; internal quotation marks omitted.]).

For all of the foregoing reasons, I agree with the defendant that the imposition of a monetary bond for the sole purpose of ensuring the safety of others deprived him of his right to bail under article first, § 8, of the Connecticut constitution. Although the majority attempts to support its contrary conclusion with certain historical facts, the majority's evidence falls well short of its mark.

For example, the majority notes that, in *Ayala*, we indicated that the right to bail provision contained in the preconstitutional declaration of rights suggests that ensuring a defendant's good behavior while released during the pretrial period was a legitimate purpose of bail at that time, and that "[t]here is no evidence . . . that the framers of the 1818 constitution intended to abandon" that purpose. (Internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Ayala*, supra, 222 Conn. 351. The majority reasons that, because courts customarily had the authority, when setting bail, to ensure a defendant's good behavior while the defendant was on pretrial release, the trial court in the present case properly "considered the need to ensure the safety of others, regardless of whether the defendant was a potential flight risk," and then set a monetary bond "as a means to ensure the safety of other persons." As I explained previously, however, in *Ayala*, we were not asked to decide whether article first, § 8, permits a court to set a monetary bond as a means of protecting public safety. In that case, rather, we were concerned with whether the constitution allows the court to set *nonfinancial* conditions of release to ensure the defendant's good behavior and to revoke bail when a defendant fails to comply with those conditions. See *State* v. *Ayala*, supra, 333–36. Our conclusion that a court may revoke the bail of a defendant who endangers public safety by committing a crime in violation of the conditions of his release does not mean that a court may set a monetary bond for the sole purpose of preventing a defendant from obtaining release in the first instance, and we expressly indicated as much in *Ayala* by clarifying that we were not endorsing preventive detention as a constitutionally permissible practice. See id., 352–53.

The majority's reliance on the language of the preconstitutional statutory right to bail is similarly misplaced. First, as I previously explained; see footnote 13 of this opinion; a comparison of the preconstitutional provi-

sion with the language of article first, § 14, of the 1818 constitution suggests that the right to bail adopted by the framers of the constitution was broader than that right under the preconstitutional provision. Second, there is no evidence that the preconstitutional provision authorized courts to set bail as a means of ensuring that a defendant remained detained prior to trial, as it provided that "no man's person shall be restrained, or imprisoned, by any authority whatsoever, before the law hath sentenced him thereunto, if he can and will give sufficient security . . . for his appearance and good behaviour in the mean time . . . ." Public Statute Laws of the State of Connecticut (1808) tit. I, § 4, p. 24. The phrase "and good behaviour *in the mean time*"; (emphasis added); indicates that, consistent with our conclusion in *Ayala*, courts had the authority to ensure a defendant's good behavior while he was released on bail prior to his appearance in court. This language further suggests that, even if courts were permitted to require financial security for that purpose—and it is far from clear that they were so authorized—they could do so only to the extent that it was necessary to ensure the defendant's good behavior *while he was released*. This does not mean that courts were authorized to circumvent the right to bail by imposing a financial condition of release as a means of detaining the defendant upon deciding *ab initio* that he likely would pose a public safety threat if released.

For similar reasons, statutes authorizing courts to require sureties of the peace or good behavior do not support the view that courts may impose a monetary bond as a means of detaining a defendant prior to trial solely on the basis of the court's belief that the defendant would pose a danger to the public if released. These so-called "peace bond" statutes authorized justices of the peace—and now authorize judges of the Superior Court—upon finding that a person posed a specific and imminent threat, to order that person to refrain from engaging in the threatened conduct during a defined period of time and to provide financial security that may be forfeited upon his failure to refrain from such conduct in accordance with the order. See, e.g., General Statutes § 54-56f (authorizing Superior Court judge to require "sureties of the peace and good behavior" from any person who "threatens to beat or kill another . . . or . . . terrifies or disturbs any person," or when court finds that "[a complainant] has just cause to fear that another will imprison, beat or kill [him]"); Public Statute Laws of the State of Connecticut (1821) tit. 21, § 36, p. 147 (authorizing justice of peace to require "sureties of the peace and good behavior" from any person who "threaten[s] to beat or kill another," or "terrif[ies] and disturb[s] the good people of the state," or when "[a complainant] has just cause to fear that [another person] will imprison, beat, or kill [the complainant]"). Although case law regarding peace

bond statutes is sparse, it is apparent that the purpose of the bond is to ensure the good behavior of the principal by imposing a financial penalty on him for failing to keep the peace. Moreover, although peace bond statutes have long granted judges the authority to commit a person to jail for failing to provide the required security, it appears that the period of detention was limited to the next session of the court having jurisdiction over the matter, at which time the court would make further orders regarding the bond. See Public Statute Laws of the State of Connecticut (1821) tit. 21, § 36, p. 148 (providing that justice of peace may commit person who fails to pay bond to jail "until he shall be discharged by due course of law, or until the next session of the county court, in said county; which court may make further order, relating to the subject matter of the complaint"). In contrast to the use of bail to incarcerate a defendant for the duration of his case, there is no indication that peace bond statutes authorized courts to detain a person for any extended period of time, in order to prevent him from committing future crimes, by setting the bond in an amount that the person could not pay.[24]

Moreover, despite this court's past description of peace bond statutes as "criminal in . . . nature"; *In re Bion*, 59 Conn. 372, 383, 20 A. 662 (1890); that characterization is somewhat misleading. Peace bond statutes plainly do not define a criminal offense, as they authorize courts to order a person to provide sureties of the peace and good behavior regardless of whether the person is charged with a crime. Thus, whereas bail was used as a means of ensuring the appearance of a defendant charged with the commission of a criminal offense, peace bonds were a limited mechanism used only when there were grounds to believe that a person posed a specific threat of future harm in that they imposed a risk of financial loss if the person failed to keep the peace for the duration of the bond.[25] Because peace bond proceedings always have been distinct from the process of setting bail in criminal cases, the existence of peace bond statutes at the time of the enactment of the 1818 constitution says little about whether a court setting bail for a person charged with a criminal offense could require a monetary bond on the basis of its belief that the defendant posed a threat to public safety.[26]

Finally, even if the existence of the peace bond statute had some arguable relevance to the meaning or scope of the right to bail under article first, § 8, it hardly provides sufficient support for the conclusion that a trial court may set bail solely for the purpose of ensuring that a defendant remains preventively detained pending trial due to future dangerousness. Because it has long been understood that the purpose of bail is to ensure the court appearance of a person charged with a crime, whereas the purpose of a peace bond is merely to pro-

vide a financial incentive for one who is not accused of a crime to refrain from future misconduct, the existence of the peace bond statute is a slender reed on which to rest the conclusion that preventive detention—which until today has never been endorsed by this or any other court of this state—is authorized under our constitution.

I emphasize that I am not unmindful of or unsympathetic to the concerns expressed by the trial court and the state regarding the need to protect the public from dangerous individuals. When a defendant who is not a flight risk is found to pose a particular threat to public safety, and when, in light of available resources, that threat can be addressed most readily by pretrial incarceration, it may seem reasonable for the court to effectively deny bail by setting a monetary bond that the defendant cannot meet and to order the defendant detained pending trial. Our law, however, provides other mechanisms—mechanisms that do not run afoul of the constitution—that courts may use to protect the safety of the public when confronted with a potentially violent defendant. For example, as this court concluded in *Ayala*, courts have the authority to impose nonfinancial conditions of release and to revoke bail if a defendant fails to comply with those conditions. See *State* v. *Ayala*, supra, 222 Conn. 347–52. Indeed, it appears that the trial court in the present case, following the appropriate procedures, could have revoked the defendant's bail for his commission of a crime in violation of the conditions of his release. See General Statutes § 54-64f. Moreover, if the people of Connecticut believe that courts should have the authority to effectively deny bail solely to protect public safety, they may wish to follow the lessons of other states and to amend the constitution to reflect that view. See footnote 17 of this opinion. As our constitutional history demonstrates, however, the right to bail guaranteed by article first, § 8, simply does not allow a court to order a defendant detained prior to conviction, whether by refusal to set bail or by the imposition of an excessive monetary bond, based exclusively on the likelihood that the accused will commit further crimes if released. Because the trial court in the present case imposed a bond for the sole purpose of ensuring that the defendant, who is undisputedly not a flight risk, would be removed from Whiting and incarcerated pending trial because of his perceived dangerousness, he was denied his constitutionally protected right to bail. Accordingly, I respectfully dissent.

[1] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great . . . ."

[2] General Statutes § 54-64f provides: "(a) Upon application by the prosecuting authority alleging that a defendant has violated the conditions of the defendant's release, the court may, if probable cause is found, order that the defendant appear in court for an evidentiary hearing upon such allegations. An order to appear shall be served upon the defendant by any law

enforcement officer delivering a copy to the defendant personally, or by leaving it at the defendant's usual place of abode with a person of suitable age and discretion then residing therein, or mailing it by registered or certified mail to the last-known address of the defendant.

"(b) If the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions imposed on the defendant's release it may impose different or additional conditions upon the defendant's release. If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions of the defendant's release and that the safety of any other person is endangered while the defendant is on release, it may revoke such release.

"(c) If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the safety of any other person is endangered while the defendant is on release and that there is probable cause to believe that the defendant has committed a federal, state or local crime while on release, there shall be a rebuttable presumption that the defendant's release should be revoked.

"(d) The revocation of a defendant's release pursuant to this section shall cause any bond posted in the criminal proceeding to be automatically terminated and the surety to be released."

[3] Prior to the incident for which the defendant was charged in the present case, the defendant had been charged with assault of public safety personnel in violation of General Statutes § 53a-167c (a), a class C felony, which is punishable by a term of one to ten years imprisonment. See General Statutes §§ 53a-35a (7) and 53a-167c (b). On May 27, 2014, the court ordered the defendant released on a promise to appear in that case. The state alleged that the defendant had committed the most recent assault on August 25, 2014, at which time he was on release with respect to the previous felony assault, thus making him subject to the revocation provisions set forth in § 54-64f.

[4] According to the majority, preventive detention is properly defined as detention without bail. See footnote 32 of the majority opinion. Of course, as the majority acknowledges, detention without bail is prohibited by article first, § 8, of the Connecticut constitution except in certain capital cases. The majority's conception of preventive detention as detention without bail, however, is too limited. In the present case, it is undisputed that the trial court intentionally set a bond that far exceeded an amount that the defendant could pay solely to ensure that he would be incarcerated in advance of trial due to his perceived dangerousness. Thus, despite the majority's apparent reluctance to acknowledge it, the defendant has been preventively detained: he remains incarcerated, unable to post a bond that was purposefully set by the court in an amount far greater than he could pay, solely on account of his perceived dangerousness.

[5] I therefore do not reach the defendant's due process claim.

[6] See, e.g., *United States* v. *Melendez-Carrion*, 790 F.2d 984, 988, 1004 (2d Cir.), cert. dismissed, 479 U.S. 978, 107 S. Ct. 562, 93 L. Ed. 2d 568 (1986). See generally L. Tribe, "An Ounce of Detention: Preventive Justice in the World of John Mitchell," 56 Va. L. Rev. 371 (1970).

[7] The court in *Salerno* also held that preventive detention pursuant to the Bail Reform Act of 1984 did not violate the substantive component of the due process clause of the fifth amendment. See *United States* v. *Salerno*, supra, 481 U.S. 746, 752. The court concluded that, because of the significant procedural protections required before bail could be denied on public safety grounds—including that the government must prove by clear and convincing evidence that no conditions of release would ensure the safety of the public—the Bail Reform Act of 1984 was sufficiently narrowly tailored to further the government's compelling interest in preventing crime by arrestees released on bail. See id., 749–51.

[8] Practice Book § 38-4 similarly requires the court to consider the safety of other persons when setting conditions of release in certain cases; see Practice Book § 38-4 (a); and authorizes the court to consider the likelihood that the defendant will commit another crime if released when setting such conditions. See Practice Book § 38-4 (b) (10).

[9] The defendant further argues that, to the extent that § 54-64a (b) autho-

rizes the court to set a monetary bond in order to protect the safety of other persons, the trial court only may consider such concerns when the defendant poses a risk to the safety of others in a manner that affects the integrity of the judicial process. I note that, as a matter of statutory interpretation, it is by no means clear that the legislature intended for § 54-64a (b) to authorize the imposition of a monetary bond solely on the basis of concerns that a defendant poses a general threat to public safety and not to ensure his appearance or the integrity of the proceedings. In the trial court, the defendant challenged that court's authority under § 54-64a to detain him solely on the ground that he posed a danger to Whiting staff and patients, but he appears to have limited his claim on appeal to the contention that the trial court's application of § 54-64a in this case violated article first, § 8, of the Connecticut constitution. Thus, although the parties have addressed the meaning of § 54-64a (b) in the context of the defendant's constitutional challenge, they have not briefed the issue of whether the trial court's imposition of a monetary bond violated the statute itself. I believe that supplemental briefing by the parties on this issue is warranted. Because, however, the majority considers only whether the imposition of a monetary bond in this case violated the defendant's state constitutional rights, I also limit my review to that claim.

[10] Article first, § 14, of the Connecticut constitution of 1818 provides in relevant part: "All prisoners shall, before conviction, be bailable by sufficient sureties, except for capital offences, where the proof is evident, or the presumption great . . . ."

[11] As we noted in *Ayala*, the statutory declaration of rights "had constitutional overtones even though it was statutory in form. *State* v. *Lamme*, [216 Conn. 172, 179, 579 A.2d 484 (1990)]; see also C. Collier, ['The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition,' 15 Conn. L. Rev. 87, 94 (1982)] . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Ayala*, supra, 222 Conn. 350.

[12] In the quoted language in *Ayala*, the year 1949 rather than 1849 appears. As the majority notes, this court mistakenly identified 1949 as the year in which the legislature added statutory language conditioning bail on a defendant's appearance. See footnote 25 of the majority opinion, citing Revised Statutes of the State of Connecticut (1849) tit. VI, c. XII, § 163, pp. 259–60. In light of the court's previous statement in *Ayala* that "[l]egislative references to either purpose were eliminated from statutes enacted after 1818 and before 1849"; *State* v. *Ayala*, supra, 222 Conn. 351; it is likely that we meant to refer to 1849 as the year in which the legislature added statutory language conditioning bail on the defendant's appearance. As I explain hereinafter, however, my review of the statutory history indicates that provisions governing the administration of bail in Connecticut have conditioned bail in criminal cases on the defendant's appearance in court since at least 1784.

[13] To the extent that we suggested in *Ayala* that the framers of the 1818 constitution intended the right to bail contained in article first, § 14, of the 1818 constitution to be coextensive with the provision contained in the preconstitutional declaration of rights; see *State* v. *Ayala*, supra, 222 Conn. 350–51; a comparison of the text of the two provisions plainly reveals that the provision adopted in the 1818 constitution provides broader protection than its preconstitutional counterpart. A preconstitutional statute provided that a person could not be detained prior to conviction unless "some express Law doth allow of, or order the same"; An Act containing an Abstract and Declaration of the Rights and Privileges of the People of this State, and securing the same, ¶ 4, reprinted in Acts and Laws of the State of Connecticut, in America (1796) p. 22; which essentially restricted the discretion of courts to deny bail in a given case unless it was expressly authorized, but left the legislature free to limit the cases in which bail was allowed. Another preconstitutional statute limited the right to bail for persons charged with treason, providing that such persons could not be admitted to bail by any authority other than the court having jurisdiction over the cause. An Act for the punishment of High-Treason, and other atrocious Crimes against the State, ¶ 3 (enacted in October, 1776), reprinted in Acts and Laws of the State of Connecticut, in America, supra, p. 420. The 1818 constitution contained no such limitation, providing for bail as a matter of right in all criminal cases not falling within the stated exception. See Conn. Const. (1818), art. I, § 14 ("[a]*ll prisoners shall . . . be bailable* by sufficient sureties, except for capital offences, where the proof is evident, or the presumption great" [emphasis added]). This expansion of the right to bail in criminal cases may be traced to a statute enacted in 1808, which provided that "all prisoners

detained in gaol for trial, for an offence not capital, shall be entitled to bail; to be taken by one or more of the judges of the court, having cognizance of the offence." Public Statute Laws of the State of Connecticut (1808) tit. XVII, c. II, § 1, p. 69. Contrary to our suggestion in *Ayala*, the fact that article first, § 14, of the 1818 Connecticut constitution more closely resembles the right to bail as expressed in the 1808 statute suggests that the framers intended the right to bail to include protections that had developed after the enactment of the provision contained in the 1750 revision of the statutory declaration of rights.

This understanding is consistent with the circumstances surrounding the adoption of the 1818 constitution. Although we acknowledged in *Ayala* that "[t]he constitution adopted in 1818 did not create a government but gave to that which had already been established the sanction of the people and, in very general language, formulated its framework"; (internal quotation marks omitted) *State* v. *Ayala*, supra, 222 Conn. 351; we did so in suggesting that, in the absence of some express indication to the contrary, the framers of the 1818 constitution intended to incorporate the same understanding of the right to bail as that expressed in the 1750 statutory declaration of rights. As I explained, however, the meaning of the bail provisions contained in the 1818 constitution can be understood only upon review of the relevant statutory and case law leading up to and culminating in the adoption of the 1818 constitution.

[14] Significantly, as a result of the 1967 legislation; see Public Acts 1967, No. 549, § 12 (P.A. 549); the General Statutes authorized courts to deny bail and order a defendant detained but expressly limited that authority to circumstances in which the court found "custody . . . to be necessary to provide *reasonable assurance of his appearance in court* . . . ." (Emphasis added.) P.A. 549, § 12, codified at General Statutes (Rev. to 1968) § 54-64a. This was the only time in our history that the General Statutes authorized the denial of bail other than in capital offenses, and the language was repealed in 1977. See Public Acts 1977, No. 77-452, § 39.

[15] See Conn. Code Evid. § 8-3 (1) (B); see also *State* v. *Pierre*, 277 Conn. 42, 72, 890 A.2d 474 ("[w]hen a party's conduct indicates that the party assents to or adopts a statement made by another person, the statement is admissible against the party" [internal quotation marks omitted]), cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

[16] Mississippi adopted its current constitution in 1890. At the time *Dennis* and *Royalty* were decided, article III, § 29, of the Mississippi constitution of 1890 provided: "Excessive bail shall not be required; and all persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses when the proof is evident or presumption great." A subsequent amendment in 1995 to article III, § 29, of the Mississippi constitution of 1890 allows courts to deny bail for serious felonies provided the defendant is afforded certain procedural protections. See 1995 Miss. Laws c. 636.

[17] The fact that *In re Underwood*, *Truesdale* and *Pray* were abrogated by constitutional amendment in no way undermines their persuasive force. Indeed, several states that had right to bail provisions similar to article first, § 8, amended their constitutions to provide that courts may deny bail if necessary to protect public safety. See M. Mann, supra, 24 Conn. L. Rev. 963 and nn.246–47 (listing such states and noting that "[t]his evidences not only recognition of pretrial detention as unconstitutional under provisions granting release in noncapital cases, but also that some of those states viewed the constitutional right to bail as precluding a public safety consider-ation"); see also, e.g., Mo. Const., art. I, § 32 (2) (adopted in 1992). That these states saw the need to amend their constitutions before allowing preventive detention lends further support to the conclusion that article first, § 8, does not permit courts to deny bail on the ground that the accused poses a danger to others.

[18] See Ill. Const. (1870), art. II, § 7 ("[a]ll persons shall be bailable by sufficient sureties, except for capital offenses, where the proof is evident or the presumption great").

[19] The Illinois Supreme Court subsequently concluded that the denial of bail when it is "necessary to prevent fulfillment of the threat [on] which the charge is based" does not violate the state constitutional right to bail. *People* v. *Bailey*, 167 Ill. 2d 210, 240, 657 N.E.2d 953 (1995).

[20] Article II, § 24, of the Missouri constitution of 1875 provides in relevant part: "[A]ll persons shall be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great."

[21] Article II, § 25, of the Missouri constitution of 1875 provides in relevant part: "[E]xcessive bail shall not be required . . . ."

[22] Significantly, even after Missouri amended its constitution in 1992 to provide that bail may be denied "upon a showing that the defendant poses a danger to a crime victim, the community, or any other person"; Mo. Const., art. I, § 32 (2); the Supreme Court of Missouri nevertheless concluded that this provision, while authorizing courts to *deny* bail when the requisite showing is made, does not "permit [the] use of bail to keep a defendant from being released." *State* v. *Jackson*, 384 S.W.3d 208, 215 (Mo. 2012).

[23] The Supreme Judicial Court of Massachusetts also has concluded that setting a monetary bond that a defendant cannot post, on the basis of his perceived dangerousness, constitutes preventive detention, and, pursuant to *Salerno*, a statutory scheme that allows courts to set bond for that purpose without providing sufficient procedural protections violates the due process clause of the fourteenth amendment. See *Aime* v. *Commonwealth*, 414 Mass. 667, 680, 611 N.E.2d 204 (1993); see also footnote 7 of this opinion. The Massachusetts constitution, unlike our own, does not expressly guarantee the right to bail, but only provides that excessive bail may not be required. See Mass. Const., pt. 1, art. XXVI. A previous iteration of that state's statutory bail provisions required courts to refuse to release a defendant without surety, and, instead, to require a bond with surety, if it found the defendant posed a danger to the community. *Aime* v. *Commonwealth*, supra, 670. The court rejected the commonwealth's argument that the statutory scheme did not purport to establish a system of preventive detention because, even though it did not expressly provide for the denial of bail, it nevertheless "accomplish[ed] this goal through the use of the surety [that] an arrestee must post in order to be admitted to bail." Id., 676. The court concluded that, pursuant to *Salerno*, the bail provisions in question violated the fourteenth amendment because "[a] [s]tate may not enact [preventive] detention schemes without providing safeguards similar to those which Congress incorporated into the Bail Reform Act [of 1984]." Id., 680. The Massachusetts legislature subsequently enacted a scheme similar to the federal Bail Reform Act of 1984, which the court upheld in *Mendoza* v. *Commonwealth*, 423 Mass. 771, 773, 673 N.E.2d 22 (1996).

[24] I therefore disagree with the majority that there is no difference, for constitutional purposes, between the limited detention authorized under the peace bond statutes and the use of bail to detain a defendant, on the ground that he poses a danger to others, from his arrest until trial.

[25] This is not to say that there would be no constitutional objection to detaining a person for failing to post a peace bond. In fact, several courts in our sister states have concluded, on various grounds, that it is unconstitutional to detain a person who is unable to post a monetary bond set in a peace bond proceeding. See, e.g., *Ex parte James*, 53 Ala. App. 632, 644, 303 So. 2d 133 (incarceration of indigent petitioner by virtue of his inability to post peace bond violated equal protection clause of fourteenth amendment to United States constitution), cert. quashed, 293 Ala. 759, 303 So. 2d 145 (Crim. 1974); *Santos* v. *Nahiwa*, 53 Haw. 40, 42, 487 P.2d 283 (1971) (incarceration of indigent petitioner by virtue of his inability to post peace bond violated equal protection of laws and petitioner's substantive due process rights because statutory scheme failed to require proof of guilt beyond reasonable doubt); *Kolvek* v. *Napple*, 158 W. Va. 568, 575, 212 S.E.2d 614 (1975) (incarceration of indigent person based on his inability to post peace bond violated equal protection clause of fourteenth amendment to United States constitution); see also *State* v. *Weller*, 152 Vt. 8, 15–16, 563 A.2d 1318 (1989) (expressing concern that peace bond was imposed "as a form of bail for preventive incarceration" but declining to reach constitutional issues after concluding that court imposed peace bond without affording defendant process required by statute).

[26] I disagree with the majority's contention that sureties of the peace "are not truly separate and apart" from bail. Footnote 28 of the majority opinion. That the sureties of the peace statute eventually was included within the same chapter of the General Statutes as the provisions governing the administration of bail provides scant support for the contention such sureties were considered to be a form of bail at the time of the 1818 constitution. In fact, in the first revision of the statutes following the adoption of the 1818 constitution, the statute providing for sureties of the peace was included within the title setting forth the powers and duties of the courts; see Public Statute Laws of the State of Connecticut (1821) tit. 21, § 36, pp. 147–48; whereas the statutes governing bail were included within the title that defined crimes and regulated criminal procedure. See Public Statute Laws of the State of Connecticut (1821) tit. 22, §§ 97, 99 and 100, pp. 171–72. The sureties of the peace statute was not transferred to the title dealing with

criminal procedure until the 1839 statutory revision. See Public Statute Laws of the State of Connecticut (1839) tit. XX, c. I, § 124, pp. 172–73. Consistent with this view, authorities on this issue have stated that sureties of the peace are *not* a form of bail but, rather, a special, limited procedure for preventing a person who appears to pose a specific threat of future harm from carrying out that threat. See L. Tribe, supra, 56 Va. L. Rev. 406 (noting availability of sureties of peace for "those who threaten specific crimes, either verbally or by repeated efforts" and that such persons "present a separate problem unrelated to the pendency of a criminal charge and [do] not [require] sweeping governmental authority to detain for generalized dangerousness"); S. Childress, "Peace Bonds—Ancient Anachronisms or Viable Crime Prevention Devices?," 21 Am. J. Crim. L. 407, 414 (1994) (observing that most courts that have addressed issue have concluded that peace bond proceedings are not criminal proceedings).

————————————————————